**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Richard BECK, Defendant-Appellee.**

**No. 79–1584.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1979.

Decided Feb. 4, 1980.

Nan R. Nolan, Federal Defender Program, Chicago, Ill., for defendant-appellee.

Thomas P. Sullivan, U. S. Atty., Scott F. Turow and William J. Cook, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellant.

Before PELL, BAUER and WOOD, Circuit Judges.

BAUER, Circuit Judge.

Defendant-appellee Richard Beck was found guilty by a jury of one count of aiding and abetting the illegal export of arms in violation of 22 U.S.C. § 2778, 22 C.F.R. § 127.01, and 18 U.S.C. § 2, and five counts of aiding and abetting the filing of false customs export declarations in violation of 18 U.S.C. § 1001, 22 C.F.R. § 127.02 and 18 U.S.C. § 2. He was acquitted of a conspiracy count. After the return of the verdicts and discharge of the jury, the trial court denied all pending defense motions, and set a date for sentencing and ruling on post-trial motions.

On May 29, 1979, six weeks after the verdict, the trial court granted the defendant's post-trial motion for a judgment of acquittal. On May 31, 1979, the court denied the Government's motion for reconsideration of the judgment of acquittal.

The Government appeals[1] the trial court's ruling on several grounds. It asserts first that the trial court applied the wrong standard for ruling on a motion for acquittal; second, that the ruling was based on improper considerations; and third, that the evidence was sufficient to support the verdict. The Government also urges us to reassign the case to another district judge for sentencing in the event of a reversal.

Because we believe that the evidence was sufficient to sustain the jury's verdict as to each of the counts upon which the defendant was convicted, we reverse.

## I.

The commercial export of arms and ammunition from the United States is governed by the Arms Export Control Act, 22 U.S.C. § 2778, and the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 121–30. Persons desiring to export arms from the United States must first register with the State Department's Office of Munitions Control (OMC) and then obtain individual export licenses for each shipment of arms abroad. 22 C.F.R. §§ 122, 123.

Licenses for specific shipments are granted or withheld by the OMC on the basis of a number of considerations, principally the foreign policy of the United States toward the country of the arms' destination. 22 C.F.R. § 123.05. Since 1963, the United States, as a matter of its foreign policy, has prohibited the commercial sale of arms to the Republic of South Africa.[2]

Richard Beck, a South African citizen, owned and operated an importing business with a partner, Roland Whiteing.[3] The business, as described by Beck, imported sporting goods, firearms, photographic equipment and radio equipment.

In April 1977, Whiteing contacted Seymour Freilich, the main operating officer of Concealable Body Armour of America (CBA), a police equipment distributor in Detroit.[4] Freilich indicated that he was willing to supply Beck with a variety of munitions. CBA was an OMC registrant, but had never applied for any arms export licenses.

Beck wrote to Freilich after Whiteing returned to South Africa. Beck's first letter of April 25, 1977 outlined what became the framework for his future arrangements with Freilich and detailed the shipping, labelling and means of payment for each shipment. Beck requested that his orders be filled in small parcels (only two or three guns to a package) in order "to make it less conspicuous from your side and also have a less chance of being confiscated en route." Beck stated that payment would be by international letter of credit. He wrote:

> We will describe the goods in our Letter of Credit to your Bank as "Sporting Goods" if this does not suit you, please advise us as soon as possible as to the description you would prefer.

The means of payment is significant in this case because the seller cannot receive payment under a letter of credit unless his shipping documents—including airway bills, commercial invoices, and export declarations—match perfectly with the buyer's terms in the letter of credit. Beck's choice of the term "sporting goods" in his letter of credit bound Freilich to use that term in his documents if he expected payment. On

---

1. This court in *United States v. Blasco*, 581 F.2d 681 (7th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978), interpreted the Government Appeals Statute, 18 U.S.C. § 3731, as authorizing a Government appeal from a post-verdict judgment of acquittal.

2. Testimony at trial established that only two licenses to export arms to South Africa have been issued since 1965. One permitted the export of one rifle for a diplomat and another permitted the export of cartridges for hunting wild dogs in Cougar Game Park.

3. The business was incorporated in South Africa as Aimcom in September 1977 and was owned equally by Beck and Whiteing. Several of the communications involved were written on Aimcom stationery.

4. Freilich and CBA pled guilty to Counts Two through Seven. The trial court had earlier dismissed the conspiracy count on double jeopardy grounds, since Freilich had been prosecuted earlier in 1978 in Detroit for other aspects of the same conspiracy. On April 24, Freilich was sentenced to two years imprisonment, the sentence to run concurrent with an 18 month sentence imposed in Detroit. CBA was fined $35,000.

cross-examination, Beck admitted that he understood the requirements of letter of credit transactions.

At the same time, Beck asked Freilich to send a separate invoice by mail listing all firearms by serial numbers for use by Beck's customs clearing agent, Freight Services. The import of American weapons into South Africa is legal under South African law; South African customs law is, however, quite strict. In order to clear through customs, Freight Services had to demonstrate that the weapons' serial numbers corresponded with invoices.

A series of letters followed, detailing orders by Beck to Freilich for various munitions.[5] Several shipments were made pursuant to the international letters of credit established by Beck. In each case, CBA—usually Freilich personally—delivered the goods directly to the air freight forwarding company. The air freight company then prepared certain shipping documents based on the information Freilich provided.

Among the documents prepared were United States Customs Export Declarations, which inform the Customs Service of the contents, ultimate consignee and ultimate destination of export shipments. Freilich told each air freight forwarding company to label the cartons as sporting goods. An employee of the forwarding company then looked to the United States Commodity Schedule B and picked the number corresponding to that description. The CBA cartons were designated number 735.-1500, which covers underwater breathing devices and game, sport, gymnastic, athletic or playground equipment. This designation was repeated on every CBA shipment.

On October 27, 1977, President Carter announced at a news conference that the United States would support a mandatory arms embargo against the Republic of South Africa to be instituted by all countries of the United Nations. The President said that the United States would intensify its existing embargo on South Africa arms sales by extending the embargo beyond firearms to include a number of categories of police and military equipment and by forbidding the sale of spare weapons parts. While the Carter announcement did not alter the existing U.S. ban on arms sales to South Africa, it focused considerable public attention on United States arms policy toward South Africa both here and in that country. As a measure of the widespread attention the Carter announcement received in South Africa, clippings were introduced at trial from three South African papers showing that the United Nations embargo, the Carter announcement and related events had provoked extensive—most often front page—coverage every day from October 26 through November 1.

On November 1, four days after the Carter announcement, Beck wrote Freilich with a new order. His letter opened:

> It is very sad that our mutual friend Mr. Carter is making our business as difficult as possible but I am sure we will circumvent his best intentions somehow.

Starting with the very next shipment on November 19, 1977, letters of credit were abandoned as the means of payment in favor of international wire transfers. A wire transfer is a direct movement of funds from buyer to seller. Unlike a letter of credit, payment by these means gives no indication to the various bank intermediaries of any details—destination, purchaser, nature of goods—involved in the underlying transaction.

While the November 19 shipment was sent directly to South Africa, the next shipment on November 23 was sent to a "Werner Saneli [sic], Gondrand Bros., Ltd., Schoneggstrasse # 5, 8021 Zurich, Switzerland." Werner Sameli is the air freight manager of Gondrand Bros., a Swiss customs broker-

---

5. We do not detail the contents of all the letters here, since the indictment charged illegal export and false statements only as to the final shipment, discussed *infra*. Evidence of the prior shipments was admitted as being material to the conspiracy charge, but was also admitted as business records and other exceptions to the hearsay rules. All of Beck's prior letters, of course, were admissible as admissions of a party opponent.

age firm.[6] Shipping documents reflected Zurich to be the ultimate destination.

The November 23 shipment was preceded in Switzerland by a telex from South Africa sent to Sameli's attention from John Buckley-Jones of Freight Services, which acted as Beck's shipping agent in South Africa and which was the South African affiliate of Gondrand Bros. The telex, dated November 24, informed Sameli that a shipment addressed to him was on its way from the United States. The telex gave the airway bill number and requested that the shipment, identified as sporting goods, be transshipped to Freight Services in South Africa.

As Jones requested, Gondrand Bros. sent the goods on to South Africa on November 29. A wire transfer for the value of the shipment and shipping costs to Zurich was sent to CBA by Aimcom the same day.

On December 28, 1977, Beck sent Freilich an extensive order. On January 23, 1978, CBA packed 140 weapons and 5,000 rounds of ammunition in ten cartons. On January 25 Freilich delivered the cartons, along with seventeen cartons of flashlights, to Pandair, his new freight forwarding company. The five shipper's export declarations, prepared at Freilich's direction, described the commodities as 27 cartons of "Sporting Equipment" with Schedule B Commodity Number 735.1500 listed on the form.

Subsequently, the shipment was sent on an American Airlines flight to Chicago, where the boxes were to be transferred to a Swissair flight to Zurich. Buckley-Jones then sent several cables to Sameli again detailing the airway bill numbers and transshipment instructions.

The shipment, however, did not leave O'Hare; it was delayed, first, because of snow, and then because one box in the shipment was misplaced. Then on February 11 an American Airlines freight handler noticed ammunition through a tear in one of the boxes. He informed his supervisor, who in turn notified federal law enforcement agencies. On Monday, February 13, the boxes were inspected by United States Customs Service agents. After examining the export declarations and confirming that OMC showed no export license covering the shipment, the agents seized the ten boxes containing the firearms and ammunition.

Unaware of the Government's seizure in Chicago, the various parties to the shipment attempted to locate the guns and ammunition. On February 21, 1978, Werner Sameli phoned Pandair in Detroit at Buckley-Jones' urging. He then telexed South Africa, informing Buckley-Jones that the cartons were still in Chicago due to snow but that they would be shipped out on the next flight to Zurich. The same day Beck sent a wire transfer for $26,532.77 to CBA covering the cost of the shipment and freight charges to Zurich.

Meanwhile in Chicago, the Customs agents loaded the Aimcom shipment onto the Swissair flight that Sameli had promised. The agents retained all of the firearms and ammunition, except one revolver which was sent on with the shipment. They filled the original cartons with old books.

The next day at 9 a. m. (Zurich time), Sameli informed Buckley-Jones that the sporting goods were on their way and requested shipping instructions. Buckley-Jones telexed back that Sameli should send the shipment on the first available Johannesburg flight.

---

6. At trial, Werner Sameli testified on the Government's behalf. Sameli explained that it is a routine part of his company's business to transship goods to other countries. Occasionally, when customers desire special control over a shipment, the airway bill is directed to him personally. He, in turn, disposes of the goods as he is instructed. Gondrand seldom inspects such shipments on its own; more important, Swiss customs almost never inspects transshipped goods as they enter or leave Switzerland. Furthermore, Switzerland, a neutral country, is not a member of the United Nations; the Swiss do not enforce any special trade sanctions against South Africa. It is, however, a violation of United States law to transship weapons beyond the point of destination stated on the export declaration. 22 C.F.R. § 123.10.

Later that day, however, after the flight arrived, Sameli refused to ship out the goods. He discovered that he was listed, not as the consignee, but as the buyer on all the documents accompanying the cartons. He therefore had full financial responsibility for the shipment. He also found a clause on the commercial invoice prohibiting diversion of the goods beyond Switzerland.[7] Sameli telexed Johannesburg that he would not do "illegal business" and that he would not ship the goods out of Switzerland.

Buckley-Jones responded the next day, February 23, and asked Sameli to hold the goods while the importer contacted the U.S.A. The next morning, February 24, Freight Services telexed Sameli that the invoices were in error and that new ones would be sent from the United States. The amended invoices never arrived.

On March 15, the shipment was seized by Swiss customs. Sameli, cooperating with Swiss customs, waited nearly two weeks to see what actions the South Africans would take before advising them of the results. Finally, on March 28, he telexed:

> (attention) mr buckley jones x re sporting goods x on the occasion of the transfer of the goods to the bonded warehouse customs ordered the shipment to be physically examined x the following contents was found x 17 cartons containing flashlights x 10 cartons containing sales boxes for revolvers filled with old books and one sales box for revolver' containing a revolver x this gun was seized by customs authorities on behalf of the swiss federal attorney x since it is illegal to import weapons of any kind aneee [sic] or handle weapons of 'any kind in transit we face prosecution and since shipment was addressed to mr sameli any measures taken will be against this person x we await your comments and we mainly are inter-

ested in who is to cover the cost accumulated x regards x w h sameli.

Buckley-Jones replied that "we are shocked and amazed to hear the news especially when you advise us of what [the] contents were."

On August 3, 1978, the instant indictment was returned against Beck, Freilich and CBA. Beck was charged with conspiracy and with aiding and abetting the commission by Freilich of two offenses involving the seized shipment: (1) the attempted export of arms without an export license and (2) the making of false statements in export declarations. Three false statements were charged in each of the five other counts:[8] (1) that the cartons contained commodities corresponding to Customs Schedule B Commodity No. 735.1500, namely underwater breathing devices and game, sport, gymnastic, athletic or playground equipment; (2) that the goods were ultimately destined for Zurich, Switzerland; and (3) that the goods were destined for an ultimate consignee named Mr. Werner Sameli, c/o Gondrand Bros. Ltd., Zurich, Switzerland. The news immediately reached South Africa where it was reported in a number of South African papers and where Beck read of his indictment.

On November 16, 1978, Richard Beck left South Africa for the United States and was arrested when he arrived in Chicago on November 17 by U.S. customs agents.

## II.

The standard for appellate review of a trial court post-verdict judgment of acquittal is the same as that applied by the trial court:

> The rule has long been established that when ruling on a motion for acquittal the test that the court must use is

---

7. This clause had not appeared on the invoice for the first Swiss shipment, which was sent by another shipper. Although the invoices on that shipment were also made out to Sameli personally, the paperwork did not reach him and the goods were sent on as Buckley-Jones had requested by another Gondrand employee.

8. The twenty-seven cartons were covered by five Shipper's Export Declarations of Shipments from the United States. Each count of the indictment concerns one of the export declarations. The five counts are identical except for the weight and number of cartons covered by each of the export declarations.

whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government . . . bear[ing] in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences."

*United States v. Blasco,* 581 F.2d 681, 684 (7th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978), quoting *United States v. Rojas,* 554 F.2d 938, 943 (9th Cir. 1977). More recently, in *United States v. Fearn,* 589 F.2d 1316, 1321 (7th Cir. 1978), we commented on the "slightly more precise, but equivalent, test [that] has been developed" in the Fifth Circuit.

There the test of the sufficiency of proof on a motion for judgment of acquittal or review of the denial of such a motion, is whether the jury might reasonably conclude that the evidence is inconsistent with the hypothesis of the defendant's innocence. *United States v. Lonsdale,* 577 F.2d 923, 925 (5th Cir. 1978). Another way of expressing the same rule is that the motion for judgment of acquittal must be granted when the evidence, viewed in the light most favorable to the government, is so scant that the jury could only speculate as to the defendant's guilt, *United States v. Herberman,* 583 F.2d 222 (5th Cir. 1978), and is such that a reasonably-minded jury *must* have a reasonable doubt as to the defendant's guilt. *United States v. Stephenson,* 474 F.2d 1353, 1355 (5th Cir. 1973). [Footnotes omitted.]

█ In considering the motion, the Court should examine the evidence as a whole including that offered by the defendant. *Id.* The standard is not so strict that the defendant's evidence must be disregarded.

█ A judgment for acquittal may not be granted merely because the jury may have reached allegedly inconsistent verdicts. Consistent verdicts are not required. *Hamling v. United States,* 418 U.S. 87, 101,

94 S.Ct. 2887, 2889, 41 L.Ed.2d 590, 611 (1974). Indeed, we have recognized that an inconsistent verdict may represent jury compassion or compromise. *United States v. Blasco,* 581 F.2d at 685 n. 9. Because it is the jury's special province to weigh conflicting testimony, determine credibility and draw factual inferences, a motion for acquittal after a jury verdict of guilty may be granted only when the relevant evidence is insufficient to prove all the elements of the charged offense.

The trial judge held two days of hearings regarding the motion for acquittal. The parties dispute first whether the trial court applied the above standard, and second, whether the ruling was based on improper grounds. We have reviewed the record of the proceedings below and are convinced that the trial judge granted the motion because he believed the evidence was insufficient to demonstrate Beck's participation as an aider and abettor in the offenses charged in Counts Two through Seven. While our decision reflects our disagreement with the court's conclusion, the judge applied the proper standard and based his decision on proper grounds.

### III.

18 U.S.C. § 2(a) provides:

Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

█ The most well-accepted formulation of the standard of proof for aiding and abetting is that expressed by Judge Learned Hand in *United States v. Peoni,* 100 F.2d 401 (2d Cir. 1938). He wrote that the prosecution must show that the defendant "in some sort associate himself with the venture, that he participate in it as in something he wishes to bring about, [and] that he seek by his action to make it succeed." *Id.* at 402.

██ The standard has two prongs—association and participation. *United States v. Greer,* 467 F.2d 1064 (7th Cir. 1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1364, 35

L.Ed.2d 590 (1973). To prove association, there must be evidence to establish that the defendant shared in the criminal intent of the principal, *United States v. Smith,* 546 F.2d 1275 (5th Cir. 1977), that is, the state of mind required for the statutory offense must be shown for conviction as an aider and abettor. The defendant, however, need not have the exact intent as the principal. The "community of unlawful intent" does not rise to the level of agreement.[9] *United States v. Lozano,* 511 F.2d 1 (7th Cir.), *cert. denied,* 423 U.S. 850, 96 S.Ct. 94, 46 L.Ed.2d 74 (1975).

■ Criminal intent is often difficult to demonstrate by direct proof; it may be inferred from the attendant facts and circumstances. *United States v. Groomer,* 596 F.2d 356, 358 (9th Cir. 1979).

■ A high level of activity need not be shown to prove participation, the second prong. "The defendant need not have participated in every phase of the criminal venture." *United States v. Diecidue,* 603 F.2d 535, 557 (5th Cir. 1979). Instead, "there must be evidence to establish that the defendant engaged in some affirmative conduct; that is, there must be evidence that [the] defendant committed an overt act designed to aid in the success of the venture." *United States v. Longoria,* 569 F.2d 422, 425 (5th Cir. 1978).

This, then, is what must be proved beyond a reasonable doubt—the state of mind required for the statutory offense, and the commission of an overt act designed to aid the commission of that offense.

■ The trial court granted the motion for acquittal because he could not find evidence of "affirmative action and participation by the defendant in the specific acts which are charged in Counts 2 through 7." Beck also asserts that he did not have the knowledge required to be an aider and abettor. We must therefore examine the substantive offenses to determine whether Beck had the requisite intent and level of participation required to be convicted as an aider and abettor.

### A.

Conviction under 22 U.S.C. § 2778(a) and (c) and 22 C.F.R. § 127.01 [10] requires proof that the defendant (1) exported or attempted to export (2) goods that are on the United States Munitions List (3) without

---

**9.** It is this fact, indeed, that distinguishes aid and abet liability from conspiracy. Conspiracy requires proof of agreement, aiding and abetting does not. *United States v. Cowart,* 595 F.2d 1023 (5th Cir. 1979). "Aiding and abetting has a broader application [than conspiracy]. It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy." *Nye & Nissen v. United States,* 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949).

**10.** 22 U.S.C. § 2778 provides in part:

(a)(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

(2) Decisions on issuing export licenses under this section shall be made in coordination with the Director of the United States Arms Control and Disarmament Agency and shall take into account the Director's opinion as to whether the export of an article will contribute to an arms race, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control arrangements.

\* \* \* \* \* \*

(c) Any person who willfully violates any provision of this section or section 2779 of this title, or any rule or regulation issued under either section . . . shall upon conviction be fined not more than $100,000, or imprisoned not more than two years, or both.

22 C.F.R. § 127.01 provides in part:

(a) It is unlawful to export or attempt to export from the United States any article . . . for which a license or approval is required by this subchapter without first obtaining the required license or written approval from the Department of State.

first having obtained a license for the export (4) willfully. The trial court found the evidence insufficient to prove Beck's participation in the attempted export. In ruling on the motion for acquittal, the trial court said Beck did nothing more than order and buy the merchandise.

> Unless every purchaser is an aider and abettor of every seller in anything the seller does in connection with the sale, there is nothing in this situation which indicates that Mr. Beck was any more than a purchaser of Mr. Freilich's merchandise, and that Mr. Freilich was the one who was responsible.

Beck adds that he did not aid an illegal export, but only arranged a legal import.

■ The buyer-seller, importer-exporter labels tend to lead the arguments down the road of semantics rather than substance. A purchaser of stolen goods is not liable as an aider and abettor of the theft because of his status as a buyer, but because he enters the plan too late. *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969). See also *United States v. Gallagher*, 565 F.2d 981 (7th Cir. 1977) (willing buyer not an aider and abettor of possession of stolen securities). The gravamen of the offense is the theft, not what happens to the goods afterwards. If the defendant does not aid the theft itself, he does not commit an act that aids the commission of the offense.

The illegal act required in a § 2778 prosecution is an export or attempted export— that is, the movement of goods across the international border. Beck did not merely purchase guns in South Africa which had already been exported. He worked actively with Freilich in developing the export plan. He gave specific packaging instructions so that there would be less chance of confiscation and said the goods should be shipped via direct South African flights for the same reason. He later arranged for a different freight forwarding company to call Freilich; Freilich changed shippers. He sent Freilich a copy of his import permits so that Freilich could tailor his invoices to Beck's needs. Beck consciously assisted the transportation of the goods across the international border. He did not enter the plan too late, but did so right on time.

*United States v. Greer*, 467 F.2d 1064 (7th Cir. 1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973), relied upon by Beck, is inapposite. In that case, the government offered no proof of assistance in the transportation of stolen goods, but instead relied upon Greer's actions in aiding and abetting the theft. We insisted that evidence be shown of participation in the transportation, a separate offense from the theft, and rejected the government's contention that no evidence was required because the transportation was a foreseeable consequence of the theft. *Id.* at 1068.

This case stands squarely in the middle between *Greer*, in which the aiding and abetting preceded the subsequent crime committed by others, and *Varelli* and *Gallagher*, in which the respective crimes of theft and possession "had already occurred without any help" from the defendants. *Gallagher*, 565 F.2d at 984. Since Beck consciously assisted the attempted export, he committed the act required to be held liable as an aider and abettor.

Beck next asserts that even if he assisted the export, he lacked the requisite intent. Beck testified at trial that he did not know that Freilich lacked an export license; he further testified that he thought the export of the guns, which he characterized as sporting goods, was perfectly legal in the United States.

■ Beck's first contention has already been rejected as a basis for overturning a guilty verdict. In *United States v. Lizarraga-Lizarraga*, 541 F.2d 826 (9th Cir. 1976), the Ninth Circuit held that the defendant need not know that he is specifically required to have an export license. Rather, "the 'willfully' requirement of § 1934 [the predecessor statute to § 2778] indicates that the defendant must know that his conduct in exporting from the United States articles proscribed by the statute is violative of the law." *Id.* at 828–29. The government must "prove that the defendant voluntarily and intentionally violated a known legal duty not to export the proscribed articles."

*Id.* Since the aider and abettor must have the same state of mind as the principal, an aider and abettor need not know that the principal needs or lacks an export license. The prosecution must only show that the defendant was aware of a legal duty not to export the articles.

Evidence adduced at trial showed that Beck had been in the arms business since 1972 and that he was a well-educated, knowledgeable businessman. Beck admitted that he knew about the arms embargo on South Africa but said he thought it was "on military weapons, military hardware and not directly on sporting rifles and sporting handguns."

The jury could have easily disbelieved Beck's story that the guns were sporting goods. The seized shipment, for example, contained 5 Armalite rifles described by Beck on the witness stand as sporting goods. These same guns were described in *United States v. Cahalane*, 560 F.2d 601, 603 (3d Cir. 1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978), as "substantially the same as a U.S. Army M–16, capable of piercing flak vests and steel helmets at substantial distances."

When President Carter made his announcement on October 27, it was widely reported in South African newspapers. In Beck's letter of November 1 he wrote

It is very sad that our mutual friend Mr. Carter is making our business as difficult as possible but I am sure we will circumvent his best intentions somehow.

The jury certainly could have drawn the inference that Beck read about or heard about the intensification of the arms embargo.[11]

 Beck testified that he thought the intensification would make it more difficult, but not impossible, to get weapons. He admitted, however, that he understood "Mr. Carter's intention was to intensify [the export ban to] include all sporting weapons

of any type." Beck also admitted that he had "no way" of circumventing Carter's intentions. It was soon after the announcement that the mode of payment was switched to a less conspicuous method, wire transfer, and a little later that the shipping route was switched. Beck's earlier letters also indicated that Freilich was to pack guns a few at a time to avoid confiscation. All of this is circumstantial evidence of a desire to avoid detection and thus also evidence of his knowledge of a duty not to export. Knowledge that the principal engages in subterfuges in order to export arms supports the inference that the alleged aider and abettor knows of a legal duty not to export the arms. *United States v. Cahalane* [arms shipped in boxes labeled "plumbing supplies"]; *United States v. Lizarraga-Lizarraga* [ammunition hidden in truck's door panel, refrigeration unit, and driver's seat].

Evidence that Beck came to the United States voluntarily was admitted to support Beck's claim that he did not know the export of the guns was illegal. Prior to his decision to come to the United States, Beck had contacted a Chicago customs broker in an effort to locate his shipment. After some inquiry, the broker was told by Customs Service Special Agent Arthur Barkman that the shipment was seized. Barkman told the broker that if Beck called again, the broker should tell Beck that he would have to appear in Chicago with proof of ownership and pay a penalty in order to obtain the guns. The broker repeated this message when Beck called on September 20. Beck said that he would not come to the United States because he would be arrested. The broker said nothing in reply. Beck testified that he did not remember making this statement to the broker.

Beck also testified that he believed the indictment was the result of some kind of mixup; that Freilich had presented an arms

11. The newspaper articles made clear that the export of arms to South Africa was, and continued to be, illegal in the United States. Articles indicated that the embargo covered all weapons, including spare parts and those in a

"grey area" of articles that could fall into police categories. Much of the CBA shipment was comprised of police caliber ammunition and guns.

license to the court and that the court had in turn dropped the indictment. Beck asked Freilich to send a copy of the court order dismissing the indictment; Freilich never did. Nevertheless, on November 14 or 15, 1978, Beck called Freilich and told him of his arrangements to travel to Chicago. On November 16, Freilich and his attorney called Agent Barkman and advised him that Beck was on his way to the United States.[12] Beck carried with him an envelope with Agent Barkman's name on it which contained documents showing his proof of ownership of the shipment. He also possessed Xerox copies of the CBA invoices for the seized shipment which were marked "Via Zurich" and which had been sent to Beck's bank on January 31, 1978 by Freilich.

The events surrounding Beck's decision to come to the United States do not necessarily exonerate Beck. The jury could have easily decided that Beck came to the United States only because he believed that the charges had been dropped. Upon arrest, he said that he did not understand why the United States was not willing to help his

country, and he told Agent Barkman's secretaries that he was a "gunrunner." He also made a tape detailing gun smuggling operations in Europe which indicated his knowledge that transshipment was used to avoid the U.S. embargo.[13]

 Admittedly there was some evidence that Beck did not have the requisite intent. When evidence conflicts, however, the trial judge must let the jury perform its historic function. *United States v. Blasco*, *United States v. Cahalane*. There was enough evidence to require jury consideration, and there was support for the verdict in the record. It was therefore error for the trial court to grant the motion for acquittal as to this count.

### B.

Conviction under 18 U.S.C. § 1001 and 22 C.F.R. § 127.02[14] requires proof that the defendant made (1) an export document (2) containing a false statement (3) knowingly and willfully. The trial court held that there was insufficient evidence of Beck's

---

12. There was some dispute at trial over the level of involvement of the government in Freilich's statements to Beck. Although Freilich's lawyer raised the possibility of arresting Beck in the United States with the United States Attorney's office, Freilich was not authorized to tell Beck that the charges against him had been dropped. Freilich did not testify at Beck's trial.

13. When Beck described the sale of American-made Remington arms in South Africa, there was the following exchange:

BARKMAN: Did they know there was an arms embargo on weapons going down there?

BECK: Remington people must have known because they did it through the European Agent.

Barkman later asked:

BARKMAN: Are you saying that Remington were sending the weapons to Europe and then from Europe your ordering them and their being sent to you?

BECK: Yes, that is correct, but my letters of credit and my money are sent to AMARCO in France, not to the United States. [M]y concern is not how they got them to Europe, my payment was made to Europe, only, in European currency.

14. 18 U.S.C. § 1001 provides in part:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

22 C.F.R. § 127.02 provides in part:

(a) It is unlawful to use any export or intransit control document containing a false statement or misrepresenting or omitting a material fact for the purpose of exporting any article or technical data for which license approval is required by this subchapter. Any false statement, misrepresentation or omission of material fact in an export or intransit control document will be considered, as made in a matter within the jurisdiction of a department or agency of the United States for the purposes of 18 U.S.C. [§] 1001, 22 U.S.C. [§] 2778 and 22 U.S.C. [§] 2779.

(b) For the purpose of this section, the term export or intransit control document includes the following:

\* \* \* \* \* \*

(2) Shippers export declarations.

participation in the preparation of the export declarations.

> Beck never saw those forms. Those forms were filed by Freilich, and by Freilich alone. They never left the United States. . . . How he is an aider and abettor in the preparation of forms which he doesn't even know are being prepared . . . is the most far fetched aiding and abetting I have ever seen.

■ At the outset, we believe the trial judge misperceived the act required to aid and abet the making of a false statement. As in all cases of aiding and abetting, it is not necessary that the defendant have knowledge of the particular means the principal in the crime uses to carry out the criminal activity. *United States v. Diecidue*, 603 F.2d 535, 557 (5th Cir. 1979). In a prosecution for violation of § 1001, the defendant is not required to be the actual preparer of the documents. *United States v. Glantzman*, 447 F.2d 199 (3d Cir. 1971); *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949). An aider and abettor of a § 1001 violation need not even know the particular document charged in the indictment will be filed. For example, in *United States v. Lozano*, 511 F.2d 1 (7th Cir.), *cert. denied*, 423 U.S. 850, 96 S.Ct. 94, 46 L.Ed.2d 74 (1975), the defendant was convicted of aiding and abetting the making of false statements to the Immigration and Naturalization Service (INS). The principal sought to improve an alien's immigration status by going through a fake marriage. The court upheld Lozano's conviction, although he was not present when the principal "filled in the petition form, and there is no direct proof that he was aware of the specific information called for or the exact responses she would make." *Id.* at 5. The court found that Lozano had committed acts which aided the making of the false statements because he actively and intentionally participated in the earlier steps of the transaction. The alien lived at a boarding house owned by Lozano, and there was evidence that Lozano put the alien in touch with someone else who helped arrange the marriage.

As shown in Part A, *supra*, the evidence demonstrates that Beck was an active participant in the earlier steps of the export scheme. His failure to participate in the actual preparation of the export declarations alone does not bar his conviction as an aider and abettor. *Accord, United States v. Austin*, 585 F.2d 1271 (5th Cir. 1978).

■ Section 1001 requires a knowing and willful intent in making a false statement. The intent requirement is satisfied when the defendant knows that misrepresentations to and concealment from a government agency are essential in order for a scheme to succeed. *Lozano*, 511 F.2d at 5. Although the defendant in *Lozano* did not order the statement to be made, it was "easily foreseeable" that the principal would "affirmatively inform the INS of the marriage and conceal its limited nature." *Id.* Personal knowledge of the false information also satisfies the intent requirement. *United States v. Glantzman.*

■ Taken together, aiding and abetting is proven if a defendant voluntarily gives false information or participates in a plan such that it is foreseeable that false information will be used in statements made to a government agency in order to further the plan. We must now look to the three specific statements charged to determine whether Beck committed an overt act designed to aid in the making of those statements and whether he had the requisite intent in so doing.

### 1. The False Commodity Number

Personnel from the freight forwarding companies employed by Freilich testified that they followed Freilich's directions in preparing the export declarations. Freilich told them that the merchandise was "sporting goods" and they then picked the Commodity Schedule B category that most closely matched that description. The goods were designated "sporting equipment" in the export declarations, Commodity Schedule B Number 735.1500, which covers the following:

Underwater breathing devices designed as a complete unit to be carried on the person and not requiring attendants. Game, sport, gymnastic, athletic, or playground equipment, all the foregoing and parts thereof.

U.S. Department of Commerce, U.S. Foreign Trade Statistical Classification of Domestic and Foreign Commodities Exported from the U.S. (1978 ed.) Schedule B at 338. Other commodities in the "735" subpart include beach balls, basketballs, bowling balls, playground, gymnasium, gymnastic, and exercise equipment, skateboards, table-tennis sets, soccer and polo equipment.[15]

As stated in Part A, the jury need not have believed Beck's protest that he thought the guns really were sporting goods. The evidence shows that Beck himself initiated the use of the term in his first letter to Freilich. Freilich was bound to use that term so long as letters of credit were utilized. Even after Beck and Freilich switched to wire transfers, the use of the term remained the constant business practice of the two men. As the *Lozano* case indicates, Beck need not have participated in the selection of the commodity schedule category, or have known the intricacies of the U.S. customs laws. It was sufficient evidence of an act of assistance that Beck supplied the false information which formed the basis of the charged statement.

The designation of the guns as "sporting goods" was made in furtherance of the purpose of exporting the goods. It was essential for the success of the plan that the true nature of the goods not be revealed. Beck admitted that such a general designation would probably not satisfy customs in his own country. This, combined with Beck's knowledge that the export of guns from the United States was illegal, was sufficient evidence of the intent required by the statute.

### 2. The Swiss Connection

There is no direct evidence that Beck ordered the Swiss transshipment but there is evidence that he knew about the transshipment plans and committed acts that contributed to the plans such that it was foreseeable that false statements would have to be made to U.S. customs in order to carry them out.

One shipment went through Switzerland prior to the one charged in the indictment. Beck acknowledged that he received the invoices for that shipment, which expressly stated that they covered guns shipped via Zurich, care of Werner Sameli. Buckley-Jones, Beck's shipping agent, telexed Sameli with the airway numbers and shipment information for the prior shipment. There was evidence showing that the only way for Buckley-Jones to have had the shipping information was to have received it from his client off the invoices. In addition, as soon as the guns reached South Africa, Aimcom sent a wire transfer to CBA covering not only the cost of the goods but also CBA's freight charges to Zurich.

Beck also put Freilich in touch with the air freight company which prepared the documents for the final shipment. That company, Pandair, was an affiliate of Gondrand Brothers, as was Beck's South African shipper Freight Services. This was an act that was part of the events leading to the Zurich diversion.

The invoices and surrounding events are circumstantial evidence of Beck's prior knowledge of the Zurich diversion and therefore are evidence of his knowledge that the statements made in the export declarations were false. As demonstrated in Part A, *supra*, Beck knew of the illegality of the export. He also admitted that the embargo would "intensify" after the Octo-

---

**15.** In sharp contrast is the "730" subpart, which covers "side arms, firearms and other arms, whether designed for *military, police, sporting, or other use*," [emphasis added], and which includes shotguns, rifles, pistols, revolvers, parts thereof, military equipment and ammunition suitable for use in pistols and revolv-ers and parts thereof. There is a specific number for "rifles not designed for military use" (730.7840) and a number for hunting and sporting ammunition (730.9630). *Id.* at 332–34. These numbers were infinitely more suitable descriptions of the merchandise being shipped.

ber 27 announcement. This, coupled with Beck's prior knowledge of the Zurich diversion from the previous shipment, supports the inference that Beck had the requisite intent. Since Beck participated in the plan, even if he did not specifically order the false statement, he committed acts sufficient, as in *United States v. Lozano*, to make him liable as an aider and abettor.

### IV.

Since in our view the evidence was sufficient to support the jury's determinations, we reverse and direct the reinstatement of the guilty verdicts as to Counts Two through Seven. As a remand is necessary for sentencing, we briefly address the arguments advanced by appellant urging that the case be reassigned to another district judge.

Appellant argues that because of certain remarks made by the district judge during previous proceedings, the Government has effectively been denied its opportunity for allocution granted in Rule 32(a)(1) of the Federal Rules of Criminal Procedure.

The court stated, in addressing the attorneys and the defendant on June 4, 1979:

Even though if they reverse me I am going to put him on probation and he could have gone home last week if I had not been so intellectually tenacious about determining that, in fact, there wasn't any basis in the evidence to find him guilty, but instead have said let the conviction stand and we will sentence him to time served, plus probation, and he could have gone home.

He is going to stay here while the appeal, which is tortuous, and normally slow, goes through the Court of Appeals.

And later on that same date:

Frankly, the whole thing to me is ridiculous at this point that a man whom, if I hadn't felt the evidence required me to set aside the judgment of conviction, I would have placed on probation treating his time served, 81 days of time served, as his sentence, and sent him home, should now be kept here for who knows how long while the formalities of deciding whether or not my determination that the evidence didn't sustain the conviction should or should not be reversed; because as a practical matter if they reverse me, I am still not going to impose a greater sentence than I have already indicated.

And still later:

[B]ut I still think there is no basis for the conviction, you see, and that is the difficulty I have.

And finally, in discussing an order of this Court directing the trial court to continue the bond pending the appeal,

Mr. Cook, it is in effect a writ of mandamus. All it says is, "to that end the District Court Clerk is directed."

They have ordered me to continue the same bond and they have said in order to make sure that is done, because obviously, we don't trust Judge Will, the Clerk is directed to retain the custody of all security posted.

This is now, at this stage of the game, to me a distressing situation, but I am going to put it back in their laps where it seems to me it belongs.

▮▮▮▮ In view of all of the above, we feel justice will be better served if some other judge passes on the matter of sentence. We express no opinion on the propriety of any sentence which might be imposed, but we invoke Circuit Rule 18 and direct the reassignment of the case on remand.

The judgment of the district court is reversed and we direct the reinstatement of the guilty verdicts as to Counts Two through Seven. The case is remanded to the district court for further proceedings under Circuit Rule 18.

REVERSED AND REMANDED WITH DIRECTIONS.