UNITED STATES of America, Appellee,

v.

Noel MURPHY, a/k/a Noel O'Murchu,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Ciarin HUGHES, Defendant, Appellant.

Nos. 86–2116, 86–2117.

United States Court of Appeals,
First Circuit.

July 7, 1988.

Charles P. McGinty, Federal Defender Office, Boston, Mass., for appellant Noel Murphy.

Francis C. Newton, Jr., Boston, Mass., by Appointment of the Court, for appellant Ciarin Hughes.

Richard G. Stearns, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief for appellee.

Before BREYER and TORRUELLA, Circuit Judges, and FUSTE,* District Judge.

FUSTE, District Judge.

Defendants-appellants Noel Murphy and Ciarin Hughes were jointly convicted in the District of Massachusetts of conspiracy to export arms without a license, conspiracy to violate the domestic firearms laws, and unlawful dealing in firearms.[1] The alleged errors they charge on appeal relate to the court's refusal to give an entrapment instruction, its refusal to grant judgments of acquittal on the conspiracy charges, and the admission of co-conspirator declarations. We affirm the rulings of the district court in all respects.

## I. FACTUAL BACKGROUND

Defendants' convictions resulted from a fourteen-month relationship that developed between defendant Murphy and an undercover FBI agent, Joseph W. Butchka, posing as "Bill," an illicit arms dealer. Their association began on March 7, 1985, in a meeting arranged by a codefendant, and ended with their arrests on May 20, 1986, aboard an aircraft loaded with weapons and ammunition at Hanscom Airfield in

---

* Of the District of Puerto Rico, sitting by designation.

1. Murphy and Hughes were acquitted of the final count, aliens illegally in possession of a firearm, 18 U.S.C.App. II, sec. 1202(a) (re-

Bedford, Massachusetts.[2] The government's evidence consisted largely of the testimony of undercover agent Butchka and other law enforcement officers, as well as recorded and videotaped meetings of appellants and Butchka. The facts are, for the most part, uncontested. However, understanding the nature of this association requires a somewhat detailed account of the telephone calls, meetings, and discussions between appellants and Butchka during the relevant period.

Butchka first met with John MacDonald, who informed him that the Irish Republican Army ("IRA") was in the market for weapons.[3] At Butchka's request, MacDonald arranged a meeting with another person he said was interested in purchasing arms. The next day, March 7, 1985, MacDonald introduced Butchka to Murphy at a restaurant in Braintree, Massachusetts. The two spoke privately. Murphy first broached the subject of weapons with Butchka, later saying that he had been sent from Ireland to purchase arms. Butchka told Murphy he could supply him with two hundred M-16 rifles, but no deal was consummated. Murphy asked Butchka to call him again on March 12.

Butchka did call on the 12th, and at Murphy's instructions, made a series of weekly calls, but no deal was struck. During this time, Butchka once reached Murphy at a Belfast telephone number. Their conversations ended with Murphy telling Butchka that if he wanted to contact Butchka, he would "go the same route again." Butchka heard nothing, and on June 6, telephoned Murphy on the pretext that he heard Murphy wanted to reach him, but Murphy said "all [he] could do is wait." For the next several months, Butchka mainly contacted and met with MacDonald, and at one meeting Butchka showed MacDonald three M-16 rifles. Butchka later told MacDonald that "the more money I make, the more money you make," and to

"get busy." Butchka several times asked MacDonald about Murphy's intentions. MacDonald expressed reservations about Murphy's ability to purchase arms.

On August 15, 1985, MacDonald informed Butchka that Murphy wanted to see him along with some "samples." Butchka met Murphy the next day in Braintree and showed him two M-16 rifles and one MP-5 submachine gun. Murphy requested to keep the guns, but Butchka refused. At the conclusion of their meeting, Murphy told Butchka to call him on September 4, saying that "I found a good contact and I definitely do not want to lose you." Four days later Butchka paid MacDonald $200.

Butchka called Murphy on September 4, and they eventually agreed to meet on September 18 at the Hyatt Regency Hotel in Cambridge. The meeting was videotaped. Butchka confronted Murphy with MacDonald's reservation that Murphy could not do business. Murphy attempted to reassure him, saying that "I found you Bill, they didn't find you ... See you're talking about an organization ... that is operating in a closed enemy environment, all around it." Murphy said he no longer wanted MacDonald involved, telling him to "look at me as your rep.... I can get into them and no one else around here can." Butchka offered a direct delivery to Ireland, and Murphy responded that "you, I mean, you're too good to be true, Bill, essentially. That might be, the, ah, factor that could turn the whole deal." They also discussed the weapons, M-16s and MP-5s. Murphy expressed his fear that Butchka "could be a fucking fed." Butchka responded that "If you say 'I don't think anything can be done,' I want you to be honest with me. Fine. Let's just say 'see you later?' OK?" Butchka agreed to meet with Murphy in October, and from then on MacDonald left the scenario.

pealed). Six other defendants pled guilty to conspiracy to export arms without a license.

**2.** Five of the other six defendants, who were recruited as off-load crew members, were arrested by FBI agents at a nearby hotel.

**3.** MacDonald, the last codefendant, also pled guilty to conspiracy to export arms without a license.

The FBI undercover agent's next meeting with Murphy was on October 9, 1985. Murphy reported, "No good, Bill." Butchka replied, "So looks like it's over then, huh?" Murphy answered, "It's really up to you, Bill ... I mean ... I'm still gonna see it through." On November 1, Murphy told Butchka that he would "have to take a break from it, for a while." Butchka wanted to deal, but Murphy said that "I really don't want to." Butchka called on December 2, telling Murphy that he could include a Stinger missile in the deal, but needed a quick response. Murphy responded that "this might change things," but on December 13, 1985, told Butchka that if he hadn't heard from Murphy by a certain day, then they would "drop it completely."

They later agreed to meet at the Lafayette Hotel in Boston on January 7, 1986. Murphy explained that he had been attempting to purchase arms since he came to the United States four years earlier, and his motivations were to put an arms deal together in order to achieve a political position within the IRA, emphasizing that he could only do it with IRA backing. "I've been looking since I came out [to the U.S.] four years ago. And I've come up against, ah, dead ends all the time. The reason I'm so keen to put the deal together is I want to get into the organization at a level above the, let's say the, ah, first stage in the whole thing."

Conversations continued. Murphy introduced Butchka to Hughes on March 24, 1986, at the Westin Hotel in Boston, identifying him as his "Belfast contact," saying "It was through him [Hughes] that I had always hoped to get into the organization." The meeting was videotaped. Each side expressed apprehensions about the other, and the discussion turned to a dry run and a subsequent direct delivery to Ireland. Butchka expressed concern that they would not have a buyer once they reached Ireland, but the defendants pledged that they had contacts there. On April 23 Murphy agreed to pay $3,100 for a dry run. The next day a bargain was made: 100 M–16 rifles and 2 MP–5 submachine guns for $50,000, $13,000 for a missile, and $10,000 for a pilot. Murphy also paid $2,600 for the test flight. (Murphy paid the remaining $500 at a later meeting).

Further calls and meetings ensued, and on May 15, Butchka met Hughes and Murphy at the Embassy Suites Hotel in Boston to fine tune the deal. This meeting was also videotaped. The plan was to land at Shannon Airport in Ireland with the rifles and ammunition. Butchka offered a Redeye missile as a gift. Murphy decided to limit the off-load crew to six. Murphy and Hughes explained that nobody would be waiting for them in Ireland, and that the weapons would be stored in safe houses until the buyers took delivery.

After working out logistics, the discussion turned towards the year's negotiations. Butchka said it took a year to get to know Murphy, and Murphy replied: "If I had said to you ... I'll see you next year, what would you have said? But the thing about it is ... I had to, uh, deceive you because I had to keep your interest ... I knew when to lie."

The plan was executed on May 20, 1986, with government agents holding a plane filled with weapons at Hanscom Airfield in Bedford, Massachusetts. Murphy, Hughes, and five others arrived at the parking lot, and the five crew members were directed to a nearby hotel. Defendants and Butchka drove towards the airfield, and Murphy showed $20,000 in $100 bills. At Hanscom, an FBI agent posing as a pilot joined the group, and Murphy handed him the roll of bills while they drove to a jet parked in the field. The following sequence at the plane was taped. The group boarded the plane. Butchka showed defendants the Redeye missile, a canister of ammunition, and one of the crated M–16s. At this point, both Murphy and Hughes were arrested. FBI agents simultaneously arrested the five members of the off-load crew at the Stouffer Bedford Glen Hotel.

## II.  THE ENTRAPMENT ISSUE

Murphy and Hughes contend that the trial court unjustly denied them an entrapment instruction. After reviewing the

above facts, we find the argument has no merit.

■ "[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, — U.S. —, —, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988) (holding that a defendant may simultaneously deny the offense charged and rely on the affirmative defense of entrapment). *See also United States v. Coady*, 809 F.2d 119, 122 (1st Cir.1987); *United States v. Fera*, 616 F.2d 590, 596 (1st Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980); *Kadis v. United States*, 373 F.2d 370, 372 (1st Cir.1967). The defendant has the initial burden to show some evidence that he was unready to commit the crime or, in other words, that "a government agent turned him from a righteous path to an iniquitous one." *Coady*, 809 F.2d at 122; *Kadis*, 373 F.2d at 374. In *Mathews*, the Supreme Court pointed out that a defendant is entitled to an entrapment instruction as long as "there is sufficient evidence from which a reasonable jury could find entrapment." — U.S. at —, 108 S.Ct. at 886. This court has sometimes referred to the standard as "more than a mere scintilla." *Coady*, 809 F.2d at 122; *Fera*, 616 F.2d at 596; *but cf. Tzimopoulos v. United States*, 554 F.2d 1216, 1217 (1st Cir.1977); *Kadis*, 373 F.2d at 374. We recognize that statements in *Coady* and *Fera* may imply that in this circuit a defendant need not meet a burden as high as the ordinary "jury issue" burden that *Mathews* imposes. But, any such implication would seem contrary to the Supreme Court's statement in *Mathews* and, in any event, seems to rest upon *dicta* in *Fera* regarding this court's earlier pronouncement in *Kadis*. Nonetheless, however lenient the standard we apply here, the appellants cannot meet it.

The evidence regarding Murphy's fervent desire to purchase arms for "fighting the British troops" in Northern Ireland was overwhelming. At their first meeting on March 7, 1985, Murphy launched the idea of buying weapons from Butchka. It was at the January 7, 1986 meeting with the FBI undercover agent at the Lafayette Hotel where Murphy more clearly identified his goal: "I'm after the big prize ... I want the political system." He figured that a successful purchase would catapult him into the inner organization of the IRA. Murphy related that he came to the United States from Ireland four years earlier, intending to put an arms deal together, but all his campaign efforts were foiled.

■ Nonetheless, Murphy argues that on three separate occasions he tried to abandon the venture and that this was sufficient evidence of unreadiness to warrant the instruction. He contends that during three conversations in 1985, he told Butchka that he had "nothing for him" and hesitated or attempted to ease out of the situation. The evidence was clear that his hesitation, if any, was not for a lack of predisposition, but from a lack of a commitment from a buyer or backer in Northern Ireland. On at least two occasions Butchka asked Murphy if he wanted to call it quits, but Murphy refused, each time affirming his commitment to deal. Murphy was far from being unready as he had had every opportunity to exit. Butchka only gave Murphy the means to strike a deal. It is clear that mere evidence of soliciting the defendant and providing him an opportunity to commit the offense does not trigger the right to an entrapment instruction. *Mathews v. United States*, — U.S. —, —, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988); *United States v. Espinal*, 757 F.2d 423, 425–26 (1st Cir.1985).

■ We cannot say in viewing the evidence most favorably towards Murphy that there existed a scintilla of evidence that Butchka corrupted an otherwise unwilling participant. Rather, Murphy actively sought an arms deal and unfortunately (for him) found the FBI. While at times Butchka may have cajoled or wheedled Murphy, for example, with the stinger missile offer, his tactics amounted to mere solicitation of a more-than-willing buyer. The trial court properly denied Murphy an entrapment instruction.

The denial of the instruction to Hughes was also proper. Butchka neither sought Hughes directly nor through Murphy. Rather, Murphy introduced Hughes to him, calling Hughes his "Belfast contact." Also, Hughes knew about Butchka's identity and role in the deal well before he met Butchka. When they first met, Hughes said "So this here's been going on a year. We still don't know any more this year than we did about you last year." Furthermore, Hughes encouraged his compatriot to keep in contact with Butchka. To conclude, Hughes showed no evidence that Butchka induced him into the crimes or that he was unready to deal with Butchka directly or through Murphy.

■ Hughes' claim to an instruction is foreclosed for an additional reason. In *United States v. Bradley*, 820 F.2d 3 (1st Cir.1987), this court refused to extend the entrapment defense to a defendant in contact only with an intermediary, and not the government agent, absent "a showing that pressure had been put upon him by the intermediary at the instruction of the government agent." 820 F.2d at 8. In order for Hughes to be entitled to an entrapment instruction then, we would have to create the fiction that Butchka forced Murphy into dealing with Hughes. This we cannot do, because Butchka neither pressured Murphy to bring into the negotiations Hughes or any additional persons. Hughes produced not a scintilla of evidence that Butchka ensnared him through Murphy.

## III. WILLFULNESS UNDER THE ARMS EXPORT CONTROL ACT

Murphy next contends that the trial court erred in refusing to grant a judgment of acquittal on count I of the indictment, the charge of conspiracy to violate the Arms Export Control Act, 22 U.S.C. sec. 2778, on the grounds that Murphy was ignorant of the act's licensing requirement.[4] He further contends that the court erred in instructing the jury under the act, arguing that the willfulness requirement of the act mandates proof of his specific knowledge of the licensing requirement and the Munitions List.

■ To sustain a conviction under sec. 2778, the government must prove that the defendant (1) willfully (2) engaged in the business of exporting (3) defense articles (4) that are on the United States Munitions List (5) without a license.[5] *See United*

---

**4.** 22 U.S.C. § 2778 provides in pertinent part:
    (a)(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.
    (b)(1)(A) As prescribed in regulations issued under this section, every person ... who engages in the business of ... exporting ... any defense articles or defense services designated by the President under subsection (a)(1) of this section shall register with the United States Government agency charged with the administration of this section, and shall pay a registration fee which shall be prescribed by such regulations.
    (b)(2) Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter....
    (c) Any person who willfully violates any provision of this section or section 2799 ... or any rule or regulation issued under either section ... shall upon conviction ... be imprisoned not more than ten years....
22 U.S.C. §§ 2778(a)(1), (b)(1)(A), (b)(2), and (c) (1979 and West Supp.1988).
      *     *     *     *     *     *
22 C.F.R. sec. 127.1 provides in pertinent part:
    (a) It is unlawful (1) to export or attempt to export from the United States any defense article or technical data or to furnish any defense service for which a license or written approval is required by this subchapter.

**5.** Clyde Bryant, Chief of the Support Services Division of the Office of Munitions Control of the Department of State, the agency designated to administer the Arms Export Control Act, testified that the M–16 rifle and the Redeye missile are on the U.S. Munitions List and subject to the

*States v. Beck,* 615 F.2d 441, 450 (7th Cir. 1980). Murphy would like to escape conviction because the prosecution did not present evidence that Murphy knew he had to register with the United States government and that the arms were on the Munitions List before sending them to Ireland. While the act does require proof of specific intent, willfulness means that "defendant must know that his conduct in exporting from the United States articles proscribed by the statute is violative of the law." *United States v. Lizarraga–Lizarraga,* 541 F.2d 826, 828–29 (9th Cir.1976) (requiring specific intent under 22 U.S.C. sec. 1934, the predecessor statute to sec. 2778). In other words, the "government must prove that the defendant voluntarily and intentionally violated a known legal duty not to export the proscribed articles." *Id.* at 829. *See also United States v. Beck,* 615 F.2d at 450. Therefore, it is sufficient that the government prove that Murphy knew he had a legal duty not to export the weapons.[6] *Beck,* 615 F.2d at 451.

The prosecution proved beyond a reasonable doubt that Murphy knew it was illegal to send the weapons out of the country. Evidence of these year-long clandestine efforts, covert acts, and subterfuges to purchase weapons for shipment to Ireland for the IRA's use supports the jury's verdict that Murphy was aware of that duty. *United States v. Cahalane,* 560 F.2d 601, 605 (3rd Cir.1977) *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *Beck,* 615 F.2d at 451.

■ The court's instruction incorporated all the elements of the offense and made clear that conviction would not require evidence that defendants knew of the licensing requirement or were aware of the mu-

nitions list. The instruction was as follows:

[a]n act is done willfully if it is committed with the knowledge that it was prohibited by law and with the purpose of disobeying or disregarding the law ... Thus, while the government must show that a defendant knew that the exportation of firearms and munitions in this case was illegal, it is not necessary for the government to show that the defendants were aware of or had consulted the United States Munitions List or the licensing and registration provisions of the Arms Export Control Act and its regulations or the National Registration & Transfer Record or the Federal Firearms Law involved in count 2 ... [I]gnorance of the law in this respect, in this case, is not an excuse. In this case, what is required is proof that the defendants acted knowingly and willfully with the specific intent to violate the law, and that's what I said to you.

The jury charge was proper under the statute and caselaw.

## IV. THE BUSINESS OF FIREARMS

Appellants were also found guilty under Count III of the indictment, which charged that defendants "engage[d] in the business of dealing in firearms and ammunition without a license," in violation of 18 U.S.C. sec. 922(a)(1).[7] Appellants contend that the evidence does not support the conclusion that they "engaged in the business of" dealing in firearms, and therefore, the court should have directed a judgment of acquittal. This court in *United States v. Tarr,* 589 F.2d 55, 59 (1st Cir.1978), adopted the definition of "business" as "that which occupies time, attention and

---

registration requirements. *See* 22 C.F.R. secs. 120.1, 121.1.

**6.** We do not read footnote 14 in *United States v. Gregg,* 829 F.2d 1430, 1437, n. 14 (8th Cir.1987), as requiring proof that the defendant know that the arms are on the United States Munitions List. Rather, we read *Gregg* as requiring the same level of proof as the 7th and 9th Circuits: "When the case gets to court, all that the Government needs to prove is that the item exported appears on the Munitions List or the

Commodity Control List, as the case may be (and, of course, that the defendant knowingly and willfully exported it, with the necessary intent and knowledge, and without the appropriate license)." *Gregg,* 829 F.2d at 1437.

**7.** 18 U.S.C. sec. 922(a)(1) reads in pertinent part:
(a) It shall be unlawful—
(1) for any person—
(A) except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of ... dealing in firearms....

labor for the purpose of livelihood or profit." [8] The court further said that "[w]hile we can conceive of a transaction sufficiently large enough in number of guns and the price paid to constitute engaging in the business of dealing in firearms, ordinarily one sale will not be sufficient to meet the statutory requirement." 589 F.2d at 59. In that case, the appellant, Tarr, delivered a machine gun to a man who then delivered it to two principals, who in turn sold it to a federal agent, with all these events occurring in one afternoon. Tarr was charged with aiding and abetting the principals in violation of sec. 922(a)(1). The court reversed a jury verdict on that count, on the basis that there was no evidence to prove that Tarr knew the principals were engaged in the business of dealing in firearms.

■ In striking contrast, this single transaction was sufficiently large in quantity, price and length of negotiation to constitute dealing in firearms. The deal involved 102 rifles, a missile, ammunition, and transportation to Ireland, all with a cost to Murphy and Hughes of $73,000. Consummation occurred after over one year of telephone calls and clandestine meetings. Moreover, there was no question about the ultimate destination of the weaponry. As to Murphy, he admitted on more than one occasion that he had been trying for four years to purchase arms for resale in Ireland. He emphasized to Butchka that this was not a "one-shot" deal, and admitted having both financial and political motives. Though he did say that he was not in the business for profit, he intended to quote a price of $107,000 to his potential buyers. Regardless of whether financial considerations were paramount, he expected this sale to provide him with a future in the

inner organization of the Irish Republican Army. The months of meetings and negotiations, along with Murphy's stated intentions, constituted a sufficient factual basis to justify the conviction under count III.

## V. CO-CONSPIRATOR STATEMENTS

Lastly, Hughes contends that the court erroneously admitted declarations of Murphy against Hughes under the co-conspirator exception to the hearsay rule. Fed.R. Evid. 801(d)(3)(E). The standard regarding admission of declarations of an alleged co-conspirator against a codefendant is governed by *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977), utilized by the district court: "[I]f it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible." Furthermore, "the defendant's membership in the conspiracy [must be] established by independent non-hearsay evidence." *Petrozziello*, 548 F.2d at 22.

■ The district court correctly applied the *Petrozziello* standard. The prosecution introduced a preponderance of non-hearsay evidence that Hughes had joined the battle at the time Murphy's declarations were made. Butchka's testimony placed both in a conspiracy to deal in arms. Furthermore, declarations made prior to the codefendant's joining the conspiracy are admissible against the codefendant under Fed.R.Evid. 801(d)(2)(E). *United States v. Baines*, 812 F.2d 41 (1st Cir.1987). Finally, Hughes' own declarations placed him in a plot with Murphy. At their first meeting, he told Butchka "So this has been going on a year. We still don't know any

---

**8.** At the time of the indictment, the statute did not define "engaged in the business." However, a recent amendment to 18 U.S.C. sec. 921 includes a definition:

(21) The term "engaged in the business" means—

(C) as applied to a dealer in firearms ... a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive

purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms. 18 U.S.C. sec. 921(a)(21)(C). *See* Firearms Owners' Protection Act, Pub.L. 99–308, 1986 U.S. Code Cong. & Ad.News (100 Stat. 449) 1327 (1986).

more this here year than we did last year about you." Based on the above, it is evident that the government established a foundation for admitting the declaration of Murphy against Hughes.

*The convictions are affirmed.*