993 F.2d 229
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
George R. MITCHELL, Defendant-Appellant.
 No. 92-5072.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 5, 1993
Decided: April 30, 1993
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. M. J. Garbis, District Judge. (CA-90-366-MJG)
 Herbert Ray Rubenstein, Herbert R. Rubenstein, P.C., Washington, D.C., for Appellant.
 Stuart A. Berman, Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 Richard D. Bennett, United States Attorney, Robert M. Thomas, Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 D.Md.
 AFFIRMED.
 Before HALL and LUTTIG, Circuit Judges, and MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 MacKENZIE, Senior District Judge:
 OPINION
 George A. Mitchell ("Mitchell") appeals from convictions for violations of 18 U.S.C. §§ 201 and 3238 (count two of the indictment) and 22 U.S.C. § 2778, 22 C.F.R. §§ 123 and 127.1, and 18 U.S.C. § 2 (count five of the indictment). Mitchell also appeals the sufficiency of the district court's downward departure from the Guideline range at sentencing. We find that the evidence was sufficient to support the convictions and hold that Mitchell may not appeal the extent of the district court's downward departure. Accordingly, we affirm the judgment of the district court.
 I. STATEMENT OF FACTS
 Mitchell was a Regional Security Officer ("RSO") at the American Embassy in Santo Domingo, Dominican Republic. As RSO, Mitchell was responsible for security at the Embassy and several other buildings in Santo Domingo used by American agencies. His primary duties as RSO included supervising a small force of six or seven Marines and a larger local force of Dominican security guards employed by Wackenhut Dominicana, S.A., which is a subsidiary of Wackenhut International, a security company that operates worldwide. J.A. 222. Wackenhut provided Embassy security pursuant to a contract with the State Department. Mitchell had no authority in his capacity as RSO to enter into procurement transactions on the government's behalf, J.A. at 20-21, 242, nor did he have authority to act as an intermediary in transactions on behalf of the United States or Wackenhut. J.A. 239.
 
 
 1
 The crimes charged in the indictment arose from Mitchell's position as RSO and his relationship with Wackenhut. Wackenhut's contract with the State Department required it to provide three patrol vehicles. Fernando Carrizosa ("Carrizosa"), an official in Wackenhut International, testified that Mitchell pressured him and Gabriel Alma ("Alma"), Wackenhut Dominicana's President, to purchase different vehicles for use in the Embassy. J.A. 61-62. Carrizosa testified that he wrote, at Mitchell's direction, a letter proposing the purchase of three additional vehicles for use at the Embassy. Carrizosa also asked that the Embassy apply to exonerate the vehicles. J.A. 63. Exoneration is a process resulting in waiver of import duties for vehicles used by foreign missions. In the Dominican Republic, these import duties amounted to as much as 300 percent of the vehicle's value. J.A. 24. Exoneration was proper because the vehicles were designated for use at the Embassy.
 
 
 2
 Mitchell approved of the vehicle purchase at an Embassy staff meeting. According to trial testimony of several Embassy employees, the understanding of all parties was that Wackenhut would purchase the vehicles and that only the three vehicles purchased would be exonerated. J.A. 17-18, 253-54. Mitchell never mentioned the purchase or exoneration of more than three vehicles. He also did not mention that he would participate personally in the purchase of any vehicles, that private citizens of the Dominican Republic would purchase any exonerated vehicles, or that he intended to engage in any personal transaction with exonerated vehicles. J.A. 17-18, 253-54.
 
 
 3
 Mitchell never acted on the Wackenhut proposal. J.A. 66. Rather, Mitchell proposed an alternate plan to Alma: Mitchell would buy three vehicles for Wackenhut for $40,000 and would buy another vehicle for Alma for $10,000. J.A. 98. Mitchell would obtain exoneration for the vehicles through the Embassy. Alma gave Mitchell $50,000 with which to accomplish this transaction, with the understanding that Mitchell would not profit from it. Mitchell then travelled to Miami in August of 1989 to purchase the vehicles. While travelling, Mitchell carried at least $39,000 of the $50,000. However, he stated on a customs declaration filled out as he was entering the United States that he was carrying less than $10,000. J.A. 503-04.
 
 
 4
 On or about August 31, 1989, Mitchell purchased four Jeep Cherokees for $39,000 in cash at a Miami automobile dealership that specialized in overseas transfers. J.A. 145-47. The dealership shipped the vehicles to "REGIONAL SECURITY OFFICE, MR. GEORGE MITCHELL, RSO" in September, 1989. J.A. 517. The vehicles were exonerated and three were transferred to Wackenhut, one to Alma for his personal use. Mitchell never returned the excess $11,000 to Wackenhut. J.A. 516-18, 103-04, 187-88.
 
 
 5
 After the first four vehicles arrived, Mitchell pressured Wackenhut to purchase additional vehicles. J.A. 104-07. Mitchell arrived at Alma's office one day with photographs of three vehicles and falsely represented to Alma that he had ordered them and that they were already on their way to the Dominican Republic. When Alma informed Mitchell that he did not have the authority to purchase more vehicles for Wackenhut, Mitchell suggested that Alma arrange transactions for his friends. The proposed arrangement would be identical to the previous transaction: Mitchell would purchase the vehicles in Miami with cash from Alma, the Embassy would exonerate the vehicles, and Alma's friends would then take possession of the automobiles. J.A. 107-88, 190, 525. Alma arranged for three friends to purchase cars at $15,000 per vehicle, and Mitchell, through other Wackenhut employees, arranged for Wackenhut's Dominican lawyer to purchase a fourth automobile for $10,000. J.A 136, 193. Thus, Mitchell obtained $55,000 in cash to purchase more automobiles.
 
 
 6
 Mitchell purchased the second set of vehicles on November 29, 1989 in Miami. He carried at least $35,000 in cash and did not declare the money on the customs form. J.A. 512-13. At the Miami dealership, Mitchell again purchased four cars-a Jeep Cherokee, an Isuzu Trooper, a Ford Taurus station wagon, and a Chevrolet Celebrity station wagon-for $35,000. J.A. 510. He retained a $20,000 profit, of which Alma and the others were unaware. As before, the automobiles were shipped to Mitchell in his name and the Embassy requested and received the exoneration. Although the exoneration requests for both transactions were handled for the most part by administrative personnel at the embassy, Mitchell played a role in encouraging the exoneration process and initiated paperwork through another Embassy employee to affect the exoneration. J.A. 246.
 
 
 7
 Wackenhut's contract also required it to provide weapons for the security force. Mitchell urged Wackenhut to buy different weapons for the security force. J.A. 79-80, 167. In response to Mitchell's requests, Wackenhut purchased twenty-five Smith & Wesson .38 caliber revolvers from a store in Miami and later turned the revolvers over to Mitchell for shipment. J.A. 87, 494. Mitchell was unhappy with this arrangement and insisted that he personally purchase more weapons with Wackenhut funds. Consequently, Alma gave Mitchell a check for $8,125, to cover the purchase price of twenty-five guns at $325 per gun. J.A. 170, 494. Mitchell's wife cashed the check and Mitchell attempted to purchase the weapons for $214.18 per gun, or a total of $5,354.50. When Mitchell made the gun transaction in August, 1989, he was aware of the regulations regarding export of firearms because of correspondence with Smith & Wesson regarding other firearms purchases. These regulations required Mitchell to obtain a license before shipping firearms. In fact, Mitchell ultimately cancelled the order from Smith & Wesson after the company wrote him a letter informing him of its refusal to ship the weapons because Mitchell had no export license. J.A. 482-88.
 
 
 8
 In November of 1989, Mitchell made another attempt at purchasing firearms from a Baltimore gun shop, using Embassy stationary and falsely representing that he was authorized to purchase weapons for the State Department. J.A. 489. This attempt initially failed when the shop owner refused to ship the weapons, again, because of Mitchell's failure to obtain an export license. J.A. 205. On November 24, 1989, Mitchell travelled to Baltimore and personally purchased the Smith and Wesson .38 caliber weapons himself for $245 a piece, exactly $2,000 less than the amount given to him by Alma. Mitchell also purchased twelve other weapons. Two of these, a Glock 9 millimeter and another Smith & Wesson .38 caliber, were for Embassy employees. The other ten guns were Smith & Wesson 9 millimeters, powerful weapons ill-suited for use at an Embassy. Employees of the gun shop helped Mitchell pack the weapons in a lead-lined wooden diplomatic box that Mitchell indicated would not be subject to inspection by Customs officials at the airport. Mitchell brought the weapons, which were all on the Munitions Export List, back to the Dominican Republic with him. J.A. 205-07. Mitchell gave Wackenhut and the two Embassy employees their weapons and sold the remainder to private citizens of the Dominican Republic at considerable profit to himself. Some of the parties to these transactions testified at Mitchell's trial.
 
 
 9
 Mitchell was charged in an eight count indictment with the following crimes:
 
 
 10
 Count One: Making false statements to a firearms dealer in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(1)(B).
 
 
 11
 Count Two: Receiving something of value for performance of an official act in violation of 18 U.S.C. §§ 201 and 3238.
 
 
 12
 Count Three: Participating as a government employee in a transaction in which he had a financial interest in violation of 18 U.S.C. §§ 208 and 3238.
 
 
 13
 Count Four: Stealing ammunition with a value in excess of $100.00 from the United States in violation of 18 U.S.C.ss 641 and 3238.
 
 
 14
 Count Five: Exporting firearms without a license in violation of 22 U.S.C. § 2778, 22 C.F.R. §§ 123 and 127.1, and 18 U.S.C. § 2.
 
 
 15
 Count Six: Transporting a monetary instrument into the United States for the purpose of carrying on a violation of the Arms Control Export Act in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2.
 
 
 16
 Counts Seven and Eight: Failing to make a true report to the United States Customs Service when carrying $10,000 or more into the United States in violation of 31 U.S.C. §§ 5326 and 5322 and 31 C.F.R. §§ 103.23 and 103.26 and 18 U.S.C.s 3238. J.A. 8-16.
 
 
 17
 At trial, the district court, over Mitchell's objection, refused to instruct the jury that as to count five, it had to find beyond a reasonable doubt that Mitchell was in the business of exporting firearms to convict him. Mitchell was acquitted of charges in counts one, three, four, and six of the indictment, and the district court dismissed counts seven and eight for lack of venue after trial. Thus, only the charges in counts two and five remained. The district court denied motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 as to those counts. At sentencing, the district court indicated that an eight level downward departure would be appropriate in light of Mitchell's previous distinguished service record and his heroic actions to save the life of the Turkish ambassador at a prior post, but that a departure of that extent would be reversed on appeal. Therefore, the district court departed downward only three levels. J.A. 457.
 
 
 18
 II. SUFFICIENCY OF THE EVIDENCE AS TO THE ILLEGAL GRATUITY COUNT
 
 
 19
 Count two of the indictment charged Mitchell with accepting something of value for performance of an official act, which act was the filing of the papers for the exoneration of the vehicles. As an initial matter, Mitchell argues that his acquittal on count three, which charged him with unlawfully participating as a government employee in a transaction in which he had a financial interest, also precludes his conviction on count two. The transaction to which count three refers is the exoneration of the vehicles. Mitchell contends that his acquittal on count three is irrefutable evidence of his innocence on the other counts relating to the exoneration.
 
 
 20
 Ruling that the acquittal on count three did mandate acquittal on the other exoneration counts would require the court to assume that the acquittal on count three was proper and that the conviction on count two was a mistake. The United States Supreme Court has noted that this assumption is "not necessarily correct." United States v. Powell, 469 U.S. 57, 67 (1984). The law insulates verdicts of acquittal from review and courts are reticent about inquiring into jurors' deliberations, making it impossible to determine whether an acquittal on a particular count might have been an exercise of lenity. Id. Consequently, inconsistent verdicts do not mandate reversal and the reviewing court should look instead to the sufficiency of the evidence with regard to each count for which the defendant was convicted. Turning to the evidence as to count two, we find it sufficient to support the conviction.
 
 
 21
 In reviewing a criminal conviction for sufficiency of evidence, the court views all the evidence in the light most favorable to the government and reverses the conviction only if no rational trier of fact could find that the prosecution proved the elements of the offense charged beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Mitchell first argues that the prosecution's evidence is insufficient because there was no agreement between him and the Wackenhut officials regarding any payment to Mitchell for the exoneration. This argument must fail, for the statute in question here does not require that the donor and the public official reach an agreement regarding payment. Rather, the statute covers any public official who "directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person." 18 U.S.C. § 201(c)(1)(B). Under this statute, the intent of the donor or donee is irrelevant; all the statute requires is that the public official receive something to which he is not lawfully entitled for performance of an official act. United States v. Evans, 572 F.2d 455, 480 (5th Cir.), cert. denied, 439 U.S. 870 (1978). Thus, the prosecution need not prove the existence of a quid pro quo in order to prove the receipt of an illegal gratuity under the statute. United States v. Brewster, 506 F.2d 62, 72 (D.C. Cir. 1974). Here, the jury properly inferred from the evidence presented at trial that Mitchell, by keeping the excess monies turned over to him by the Wackenhut officials, received something of value for attempting to obtain the exoneration of the vehicles. Thus, Mitchell's argument with regard to the issue of the agreement between him and the Wackenhut officials is without merit.
 
 
 22
 Next, Mitchell submits that the evidence was insufficient as a matter of law to convict him because he actually lacked the power to exonerate the vehicles. This argument also must fail because the official need not have the power to provide the official act in question to be convicted under the statute. Evans, 572 F.2d at 479; see also Hurley v. United States, 192 F.2d 297, 300 (4th Cir. 1951) (finding that predecessor bribery statute did not require that public official actually possess the power to perform official act). It is immaterial that Mitchell was not authorized to grant exoneration or initiate the exoneration process.
 
 
 23
 Finally, Mitchell asserts that because he did not actually file the exoneration application the evidence fails to show that he performed an official act. It is of no moment that Mitchell may not have actually filled out the form, for Mitchell was also charged under 18 U.S.C. § 2(b), which provides that when a defendant causes someone else to commit a criminal act, he is guilty as a principal despite the fact that he did not commit the direct act. A conviction unders 2(b) is proper even when the defendant acted through innocent agents. United States v. Ruffin, 613 F.2d 408, 412 (2d Cir. 1979); United States v. Bradley, 540 F. Supp. 690, 693 (D. Md. 1982). Several prosecution witnesses testified that Mitchell told people he would apply pressure to start the exoneration process on the vehicles, and Mitchell had another Embassy employee initiate paperwork on the exoneration. The evidence was sufficient to support the conviction unders 2(b) and the district court properly denied the Rule 29 motion.
 
 
 24
 III. THE JURY INSTRUCTION ON THE FIREARMS COUNT
 
 
 25
 Mitchell also argues that the district court improperly refused to instruct the jury that engaging in the business of supplying firearms was a necessary element of a violation of 22 U.S.C.s 2778 and 22 C.F.R. §§ 123 and 127.1. Mitchell's argument confuses two separate parts of § 2778. § 2778(b)(1)(A) requires that persons in the business of exporting arms obtain a license. § 2778(b)(2), on the other hand, imposes a licensing requirement for each export of listed firearms, regardless of whether the exporter is a licensed dealer. See United States v. Durrani, 659 F. Supp. 1177 (D. Conn.), aff'd, 835 F.2d 410 (2d Cir. 1987). Most courts of appeal that have considered the issue to date have agreed that engaging in the business of exporting firearms is not an element of a violation of § 2778(b)(2) or 22 U.S.C. § 1934, a predecessor statute of § 2778 which used substantially similar language.[1]
 
 
 26
 United States v. Murphy, 852 F.2d 1 (1st Cir. 1988), cert. denied, 489 U.S. 1022 (1989), cited by Mitchell for the proposition that being engaged in the business of selling firearms is an element of a violation of § 2778(b)(2), appears to be an anomaly. Although that case does mention the business requirement as an essential element of a § 2778(b)(2) violation, it cites Beck, which does not hold that being engaged in business is an element of a § 2778 violation. Id. at 6-7. Furthermore, the case is inconsistent in that it quotes with approval the following language from Gregg: " 'When the case gets to court, all that the Government needs to prove is that the item exported appears on the munitions list ... (and of course that the defendant knowingly and willfully exported it, with the necessary intent and knowledge, and without the appropriate license).' " Id . at 7 n.6 (quoting Gregg, 829 F.2d at 1437). Thus, the language at issue in Murphy appears to have been an oversight and that case is not persuasive. We hold that being in the business of selling firearms is not an element of a violation of § 2778(b)(2) and that the district court correctly instructed the jury on the elements of the offense.
 
 
 27
 IV. SUFFICIENCY OF THE EVIDENCE AS TO THE FIREARMS COUNT
 
 
 28
 Mitchell also contends that there was insufficient evidence to show that he "willfully" violated § 2778. When willfulness is an element of an offense, the government is required to prove that the defendant knew he was violating the law. The Supreme Court last explained the scope of a willfulness requirement in Cheek v. United States:
 
 
 29
 Willfulness, as construed by our prior decisions in tax cases, requires the government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty. [ ] But carrying this burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws. This is so because one cannot be aware that the law imposes a duty upon him and yet be ignorant of it, misunderstand the law, or believe the duty does not exist.
 
 
 30
 111 S.Ct. 604, 610-11 (1991). Although this court has suggested that the Cheek definition of willfulness is limited to tax cases, see United States v. Rogers, 962 F.2d 342, 344 (4th Cir. 1992), we assume without deciding that the more stringent Cheek standard for willfulness applies to § 2778. Under Cheek, the evidence here was sufficient to show that Mitchell, who had experience ordering arms from the United States, was aware of the legal prohibition on unlicensed arms exports. In fact, the evidence reveals that Mitchell, after being informed by both Smith and Wesson and the Baltimore gun shop that the law barred unlicensed firearms exports, took affirmative steps to evade the law by purchasing the weapons himself. Furthermore, the fact that Mitchell used a lead-lined diplomatic box to store the weapons and evade inspection by Customs agents is strong circumstantial evidence tending to show that Mitchell knew he was violating the law. The district court correctly denied Mitchell's motion pursuant to Rule 29 with regard to the charge of exporting firearms without a license.
 
 V. THE EXTENT OF THE DOWNWARD DEPARTURE
 
 31
 Lastly, Mitchell appeals the extent of the downward departure because of the comments made by the trial court at sentencing about this court's view of the appropriate extent of departure. Generally, the court of appeals lacks jurisdiction over an appeal of the district court's refusal to make a downward departure from the Guideline range. United States v. Bayerle, 898 F.2d 28, 30-31 (4th Cir.), cert. denied, 498 U.S. 819 (1990). Further, even if the district court decides to depart on one ground, the court of appeals lacks jurisdiction over the refusal to depart further on another ground. United States v. Ghannam, 899 F.2d 327, 328 (4th Cir. 1990). The logical extension of this principle is that the extent of the departure, if made, is also unappealable.
 
 
 32
 Mitchell contends that his case falls into a narrow exception to the general rule established in Bayerle-that a defendant may appeal a refusal to depart based on the district court's mistaken impression that it lacked the authority to depart. 898 F.2d at 31. Mitchell argues for an extension of this exception to include situations in which the district court makes a less generous departure because it is under the mistaken impression that it lacks authority to do so. According to Mitchell, the district court in this case was under such a mistaken impression.
 
 
 33
 Although Mitchell's argument has some superficial appeal, it fails to account for the fact that the extent of the downward departure is always dependent on the trial court's exercise of discretion. The Bayerle exception stems from the court of appeals' jurisdiction over sentences imposed in violation of law. See id .; 18 U.S.C. § 3742(a)(1). The exercise of discretion inherent in determining the extent of a departure, by its very nature, cannot result in a sentence imposed in violation of the law. Thus, the Bayerle exception does not apply to the extent of a downward departure and we join eight other courts of appeal in holding that we lack jurisdiction over appeals from what the defendant perceives as an insufficient downward departure.[2]
 
 VI. CONCLUSION
 
 34
 For the reasons stated above, the judgment of the district court is
 
 AFFIRMED
 
 
 [1]
 See, e.g., United States v. Gregg, 829 F.2d 1430, 1437 n.14 (8th Cir.) (construing § 2778(b)(2)), cert. denied, 486 U.S. 1022 (1987); United States v. Beck, 615 F.2d 441, 450 (7th Cir. 1980) (same); United States v. Lizarraga-Lizarraga, 541 F.2d 826, 828-29 (9th Cir. 1976) (construing 22 U.S.C. § 1934); Samora v. United States, 406 F.2d 1095, 1098 (5th Cir. 1969) (same)
 
 
 [2]
 See United States v. Bromberg, 933 F.2d 895, 896 (10th Cir. 1991); United States v. Gregory, 932 F.2d 1167, 1169 (6th Cir. 1991); United States v. Pighetti, 898 F.2d 3, 4 (1st Cir. 1990); United States v. Gant, 902 F.2d 570, 573 (7th Cir. 1990); United States v. Parker, 902 F.2d 221, 222 (3d Cir. 1990); United States v. Left Hand Bull, 901 F.2d 647, 650 (8th Cir. 1990); United States v. Wright, 895 F.2d 718, 719-22 (11th Cir. 1990) (per curiam); United States v. Colon, 884 F.2d 1550, 1556 (2d Cir.), cert. denied, 493 U.S. 998 (1989)