**UNITED STATES of America, Plaintiff,**

**v.**

**Joseph Danley OBIECHIE, Defendant.**

**No. 92 CR 342.**

United States District Court,
N.D. Illinois, E.D.

July 1, 1993.

James Shapiro, Asst. U.S. Atty., Chicago, IL, for plaintiff.

James Valentino, Jr., Streamwood, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Defendant, Joseph Daniel Obiechie, is charged with unlawfully dealing in firearms and unlawfully exporting or attempting to export fifty (50) Beretta .25 caliber semi-automatic pistols and ninety (90) boxes of .25 caliber Remington ammunition from the United States to Nigeria during the period January 7, 1992 through May 5, 1992. Count I of the indictment charges defendant with knowingly and willfully engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A). Counts II through IV of the indictment charge defendant with knowingly and willfully exporting or attempting to export firearms and ammunition (defense articles on the U.S. Munitions List) without a license in violation of 22 U.S.C. § 2778.

This matter was tried before the court in a three day bench trial. The evidence at trial established that defendant went to Shore Galleries, Inc. ("Shore") in Lincolnwood, Illinois in late 1991 to purchase firearms. Shore is one of Illinois' largest wholesale and retail firearms establishments. Defendant was advised that he had to possess an Illinois Firearms Owners Identification ("FOID") card in order to purchase firearms. Personnel at Shore assisted defendant in completing the application form and defendant subsequently received the card.

Defendant returned to Shore on December 3, 1991 with his FOID card and purchased one .25 caliber Beretta handgun. Defendant, who is in the business of buying and exporting computer merchandise to Nigeria, subsequently traveled to Nigeria with both the Beretta and his computer merchandise in his luggage.

Thereafter defendant made three more purchases at Shore: eight Berettas on January 2, 1992; 20 Berettas and 40 boxes of ammunition on April 15, 1992; and 21 Berettas and 50 boxes of ammunition on April 30, 1992. After each of the purchases, Shore enforced the three day waiting period required by Illinois law before delivery of the purchased firearms. Shore also completed and mailed the requisite Bureau of Alcohol, Tobacco and Firearms ("ATF") Forms 3310.4 and 4473 following each purchase.

After examining the records of defendant's January 2, 1992 and April 15, 1992 multiple firearms purchases, an ATF agent suspected that defendant might be supplying firearms and ammunition to Chicago gangs. The ATF then requested Shore's cooperation in allowing an ATF agent to act as a salesperson to electronically record defendant's conversation when he returned to accept delivery of his April 30, 1992 order.

Shore agreed to the request and ATF Special Agent Todd Reichert, wearing a body recorder and transmitter, waited on defendant when he returned on May 5, 1992 to accept delivery of 21 Berettas and 50 boxes of ammunition. When defendant left the store, Agent Reichert signaled to other agents and a detail of the Chicago Police gang crimes unit. The latter undertook a "traffic" stop of defendant when he entered the city limits of Chicago where it is illegal to possess an unregistered handgun.

Defendant waived his *Miranda* rights and consented to a search of his vehicle. The firearms and ammunition were recovered from the trunk of defendant's car. Defendant was taken to a Chicago Police district station where he volunteered to a consensual search of his Chicago apartment, which the police declined. Defendant was subsequently arrested for the following federal offenses.

## I. SECTION 922(a)(1)(A)

Section 922(a)(1)(A) of the Gun Control Act of 1968 provides that it is unlawful for any person:

except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing,

or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce.

18 U.S.C. § 922(a)(1)(A). The Act defines a dealer as "any person engaged in the business of selling firearms at wholesale or retail." 18 U.S.C. § 921(a)(11)(A). "Engaged in the business" is defined as:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases or firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C). The term "with the principal objective of livelihood and profit" means that "the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22). The government does not have to show, however, that defendant's primary business was dealing in firearms or that he made a profit from such dealing. See *United States v. Masters*, 622 F.2d 83, 88 (4th Cir.1980).

As originally enacted, section 922(a)(1)(A) had no scienter or mens rea requirement. Unlicensed dealing in firearms was essentially a strict liability offense. Congress determined that the lack of a mens rea requirement could result in severe penalties for those who unintentionally violated firearms offenses and passed the Firearms Owners' Protection Act in 1986 which amended 18 U.S.C. § 924(a)(1)(D) to include the element of willfulness in the underlying offense:

> Whoever ... willfully violates any other provision of this chapter, shall be fined not more than $5000, imprisoned not more than five years, or both, and shall become eligible for parole as the Parole Commission shall determine.

See *United States v. Collins*, 957 F.2d 72, 74 (2d Cir.1992). By amending section 924(a)(1)(D), Congress added the element of willfulness to section 922(a)(1)(A) and the other firearms offenses of the Gun Control Act of 1968.

Congress, however, failed to define "willfully" in the context of this Act. The Seventh Circuit's Committee on Federal Criminal Jury Instructions stated that as used in various criminal statutes, "willful" has been construed to mean:

> an act done voluntarily as distinguished from accidentally, with bad purpose, without justifiable excuse, without grounds for believing it was lawful, or with careless disregard for whether or not one has the right so to act. See *United States v. Murdock*, 290 U.S. 389, 394–95 [54 S.Ct. 223, 225–26, 78 L.Ed. 381] (1933).

Federal Criminal Jury Instructions of the Seventh Circuit (1980), 6.03 at 83. The Committee also noted that an act has been defined as "willful" in tax prosecutions "if done voluntarily and intentionally with the purpose of avoiding a known legal duty." *Id* at 83, citing *United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976); see *Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991).

Few cases have construed the willfulness provision of section 924(a)(1)(D). The Fourth Circuit stated: "We express no opinion on the question of whether 'willfully' does indeed require proof that the defendant violated a known legal duty." *United States v. O'Conner*, 915 F.2d 1566, 1990 WL 153985 *1, 1990 U.S. App. LEXIS 18201, *4 (4th Cir.1990). The Second Circuit rejected the argument that "willfully" requires the government to prove that the defendant had specific knowledge of the statute and intentionally violated it. *United States v. Collins*, 957 F.2d 72, 75–76 (2d Cir.1992). After lengthy analysis of the legislative history, the *Collins* Court determined that the "willfulness" element was to be read broadly to require the government to prove only that "the defendant's conduct was knowing and purposeful and that the defendant intended to commit an act which the law forbids." *Id* at 76. The Second Circuit did not define willful to require proof that the defendant

knew the relevant statute and purposely violated his legal duty thereunder.[1]

◼ This court does not believe that the definition of "willful" applicable to tax prosecutions should be extended to section 922(a)(1)(A). The Fourth Circuit in *United States v. Rogers*, 962 F.2d 342, 344 (4th Cir. 1992) reasoned that to require proof that defendant knew his actions were illegal was at odds with basic assumptions of criminal law. Where the law imposes criminal liability, the requirement that defendant's actions be "willful" generally " 'means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.' " *Rogers* at 344, citing *United States v. Scanio*, 900 F.2d 485, 489 (2d Cir. 1990), quoting *American Surety Co. v. Sullivan*, 7 F.2d 605, 606 (2d Cir.1925). The Fourth Circuit explained:

> This interpretation of "willful" [set forth by Judge Learned Hand in *American Surety Co. v. Sullivan, supra*] runs parallel to the rule that "ignorance of the law is no excuse." That rule is "deeply rooted in the American legal system," *Cheek v. United States*, 498 U.S. 192 [199] 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991), and exceptions to it must not be casually created.

*Rogers* at 344.

In *Cheek*, the Supreme Court determined that proof that defendant knew his conduct was illegal was necessary due to the complexity of the federal tax code. *Cheek*, 498 U.S. at 199–200, 111 S.Ct. at 609–610. This exception to the traditional definition of "will-

ful" is not relevant in this case. Unlike the Internal Revenue Code, the Gun Control Act of 1968 is not unduly complex so that a person *in the business of dealing in firearms for livelihood and profit* would be unable to determine what the law requires. Neither the statutory language nor the legislative history compel the conclusion that Congress believed that defendant's knowledge of the illegality of his acts must be proven.

◼ To establish a violation of 18 U.S.C. § 922(a)(1)(A), the government must prove: (1) that defendant was not a licensed dealer, and (2) willfully engaged in the business of dealing in firearms. The evidence established that defendant did not possess a license to deal in firearms and was engaged in the business of dealing in firearms for livelihood and profit. Given defendant's tape recorded conversation, there was substantial evidence that defendant intended to sell the 21 Beretta pistols purchased on May 5, 1992 in Nigeria. Defendant's taped statements further established a reasonable inference that he had previously sold the other 29 Beretta pistols for profit in Nigeria.

Much of counsels' argument was directed to defendant's tape recorded conversation with Agent Reichert at Shore Galleries. The court was attentive to the context in which defendant made statements on the tapes played to the court. The court finds the following statements were incriminating on the issue of whether defendant intended to sell or sold the Berettas for profit in Nigeria or whether he gave them away to the "Chief" as defendant testified at trial:

---

1. The Second Circuit in effect determined that section 922(a)(1)(A) was a general intent as opposed to a specific intent crime. According to the Seventh Circuit's Committee on Criminal Jury Instructions, courts have traditionally distinguished between "specific intent" and "general intent" crimes. "Specific intent" crimes are generally defined as follows:

   > Specific intent, as the term applies, means more than the general intent to commit the act. *To establish specific intent the government must prove that the defendant knowingly did an act which the law forbids* (or knowingly failed to do an act which the law requires), *purposely intending to violate the law.*

   Federal Criminal Jury Instructions of the Seventh Circuit (1980), 6.02 at 79, citing W. LaBuy, Jury Instructions in Federal Criminal Cases

   § 4.04 reprinted in 33 F.R.D. 550 (emphasis added). Conversely, "general intent" crimes do not require proof that defendant knew his actions violated the law:

   > In determining defendant's intention the law assumes that every person intends the natural consequences of his voluntary acts (or omissions). Therefore, *the general intent required to be proved as an element of the crime is inferred from defendant's voluntary commission of the act forbidden by law* (or his omission of the duty required by law), and *it is not necessary to establish that defendant knew that his act (or omission) was a violation of the law.*

   Id., 6.02 at 79, citing W. LaBuy, Jury Instructions in Federal Criminal Cases § 4.03 reprinted in 33 F.R.D. 549 (emphasis added).

"Sometimes you make about forty percent." T.14

"Big risk factor." T.14

"In terms of the government, you know, um, even if you have a license, you're not allowed to take more than two [firearms into Nigeria]." T.14

and,

"They don't know I *buy and sell* guns [in the context of instructing Agent Reichert not to tell other Nigerians who may come to the store about defendant]." T.15 (Emphasis added.)

"I *sell* guns for protection to governors, commissioners." T.15 (Emphasis added.)

"See they [government civilians in Nigeria] don't have access *to buy*." T.17 (Emphasis added.)

"That's why I make forty percent." T.17

This evidence established beyond a reasonable doubt that defendant was engaged in the business of buying (from Shore) and selling (in Nigeria) firearms based upon his repetitive purchases of multiple numbers of firearms. Nor can there be any doubt that he did so for profit given his taped admission of a forty percent return on his investment. 18 U.S.C. 921(a)(21)(C).

II. *22 U.S.C. § 2778(b)*

■ ' Section 2778(a)(1) of the Arms Export Control Act sets forth the purpose behind government regulation of the importation and exportation of American-made military firearms and ammunition:

In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

22 U.S.C. § 2778(a)(1). Section 2778(b)(2) of the Act provides:

Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter, except that no license shall be required for exports or imports made by or for an agency of the United States Government (A) for official use by a department or agency of the United States Government, or (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means.

22 U.S.C. § 2778(b)(2). The Act provides that defense articles enumerated in the United States Munitions List may not be exported without a license unless the official use or foreign assistance exceptions set forth in Sections 2778(b)(2)(A) or (B) are met. Semiautomatic firearms to caliber .50 and all component parts and ammunition for said firearms are designated as "significant military equipment" on the Munitions List. 22 CFR § 121.1(a) and (b) (Category I—Firearms (a)) (Category III—Ammunition (a)) (1992).[2] The regulations define "significant military equipment" as articles for which "special export controls are warranted because of their capacity for substantial military utility or capability." 22 CFR § 120.19 (1992).

Before exporting any defense article on the Munitions List, an individual must apply for an export license from the State Department's Office of Munitions Control. The application requires a description of the defense articles, their ultimate destination and their intended use. 22 CFR §§ 123.1, 123.9 (1992). If the State Department grants the license, the individual must present it to the Customs Service at the time of export. 22 CFR § 123.25 (1992).

**2.** The Munitions List is set forth in its entirety in Appendix 1.

The Act prohibits the issuance of export licenses to foreign persons. 22 U.S.C. § 2778(g)(5). The State Department's Office of Munitions Controls is also prohibited at times from issuing licenses for the export of arms to certain countries. See *United States v. Beck,* 615 F.2d 441, 451 (7th Cir.1980) (export of arms to South Africa illegal pursuant to President Carter's arms embargo); *United States v. Schwartz,* 924 F.2d 410, 416 (2d Cir.1991) (during period in question, the Munitions Control Office was prohibited by law from issuing licenses for the export of arms to Argentina; it was also the office's policy to deny all applications for shipments to the Soviet Union, Poland, East Germany and Iraq).

Section 2778(c) imposes criminal sanctions on persons who "willfully" violate the Arms Export Control Act. 22 U.S.C. § 2778(c). In *United States v. Lizarraga–Lizarraga,* 541 F.2d 826, 827 (9th Cir.1976), the Ninth Circuit analyzed the "willful" requirement as follows:

> Two features of 22 U.S.C. § 1934 [the predecessor statute to 22 U.S.C. § 2778] strongly indicate that Congress used the term "willful" to require a showing of specific intent. First, the statute prohibits exportation of items listed by administrative regulation, not by the statute itself. Second, upon referring to the pertinent regulation, 22 C.F.R. part 121, we find that the regulation contains an exhaustive list of items including amphibious vehicles, pressure-breathing suits, aerial cameras, "privacy devices," and concealment equipment (including paints). Unlike those substances which are known generally to be controlled by government regulation, such as heroin or like drugs, these items might be exported or imported innocently. Under such circumstances, it appears likely that Congress would have wanted to require a voluntary, intentional violation of a known legal duty not to export such items before predicating criminal liability.

As additional authority for our holding today that the term "willful" in § 1934 requires a showing of specific intent, we rely upon the interpretation by courts of the term "willful" in the Revenue Acts. See 26 U.S.C. §§ 7201–07.

The Seventh Circuit adopted the Ninth Circuit's "willfulness" standard and held that the government must prove that defendant voluntarily and intentionally violated a known legal duty. *Beck* at 450. The Ninth Circuit's analysis has been adopted by other circuits. See *United States v. Davis,* 583 F.2d 190, 193 (5th Cir.1978); *United States v. Gregg,* 829 F.2d 1430, 1436 (8th Cir.1987); *United States v. Murphy,* 852 F.2d 1, 6 (1st Cir.1988); *United States v. Adames,* 878 F.2d 1374, 1377 (11th Cir.1989).

The Seventh Circuit has held that "willfulness" does not apply to the licensing requirement although it incorrectly attributed the resolution of this issue to *Lizarraga. Beck,* 615 F.2d at 450 ("defendant need not know that he is specifically required to have an export license"). The Second Circuit has also held that the government need not prove defendant's knowledge of the Munitions List or its content. See *Murphy* at 7.

Given the stated purpose of the Arms Export Control Act—to further "world peace and the security and foreign policy of the United States," it is surprising that the Ninth Circuit and other circuits have determined the unlawful exportation of military hardware to be a specific intent rather than a general intent crime. To convict, the government must show a specific intent to violate the Act and prove that defendant violated a known legal duty *not* to export military firearms and ammunition without a license. Although the Ninth Circuit stated that many items on the Munitions List might be exported innocently, this court's review of the list shows virtually all the items to be either military hardware or have a military application. The list includes firearms, howitzers, flamethrowers, rockets, bombs, grenades, torpedoes, mines, launch vehicles, missile and anti-missile systems, warships, tanks, military aircraft, antisubmarine warfare trainers, military body armor, missile tracking and guidance systems, night viewing equipment, bombing computers, military infrared, nerve gas, nuclear weapons and nuclear testing equipment. (See Appendix 1 for Munitions List). Despite world peace and national se-

curity being at stake, the courts have allowed the unlawful exportation of military hardware to be excused under an "ignorance of the law" defense.

Contrary to the Ninth Circuit's assertion that firearms are not "known generally to be controlled by government regulation" [*Lizarraga* at 827], firearms are regulated at the federal, state and local levels.[3] Given these laws, individuals are aware that serious consequences may result from having a firearm in one's house or on one's person without a license—much less ‘exporting firearms and ammunition outside the United States without a license.

. The Ninth Circuit in *Lizarraga* specifically relied on the Supreme Court's definition of "willful" for tax prosecutions and extended that definition to Section 2778 cases. However, in recently affirming this definition of "willfulness" in tax cases, the Supreme Court emphasized that exceptions to the rule that "ignorance of the law is no excuse" should not be created casually. See *Cheek*, 498 U.S. at 199, 111 S.Ct. at 609. Contrary to the tax code, the Arms Export Control Act lacks the complexity to justify an "ignorance of the law" defense for individuals illegally engaged in the arms trade.

■ Because the district court is constrained by Seventh Circuit precedent, it must construe the Act as a specific intent crime. In sum, to establish a violation under Section 2778(b)(2), the government must prove that defendant: (1) exported; (2) defense articles on the United States Munitions List; (3) without a license; (4) willfully.

The evidence failed to establish beyond a reasonable doubt that defendant violated a known legal duty not to export the proscribed firearms and ammunition without a license to do so. The government contends that after defendant waived his *Miranda* rights, he informed the arresting officers that he shipped firearms to Nigeria by placing them at the bottom of his trunk under his clothing and computer equipment. The government argues that this alleged subterfuge

is evidence that defendant knew he was violating a known legal duty not to export the proscribed articles without a license. Despite defendant having denied making this statement, the court finds it strains credulity to conclude that a determined smuggler would rely. on so pedestrian a subterfuge to defeat U.S. or Nigerian Customs. One would have· to assume that Customs inspectors the world over (including Nigeria) satisfy themselves with only a look-see when it is common knowledge that they routinely conduct hand searches of the contents of luggage and, at times, physical pat downs of persons. Furthermore, it was stipulated that U.S. Customs does not routinely search outbound luggage, a fact that a computer exporter such as defendant would be aware.

Because defendant identified the "purpose" of his firearms purchases as "sale" and "resale" on the first two receipts and "gift" on the latter two receipts, the government further asserts that defendant had some knowledge of licensing requirements. There are two defects with the government's argument. It cannot be reasonably inferred that defendant knew an export license was required merely because he changed the stated purpose of his purchases from "sale" to "gift."

At best, this evidence is relevant to Count I to prove that defendant was in the business of dealing in firearms. for a profit. The receipts for the first two purchases confirm that defendant purchased the guns for resale. It could reasonably be inferred that defendant realized it was illegal for an unlicensed person to sell firearms for a profit and, therefore, he changed the receipts for his subsequent purchases from "sale" to "gift."

The government also cites defendant's "Yeah" response to Agent Reichert's observation that taking firearms to war torn former Yugoslavia might be "illegal." The court finds this response too equivocal to prove willfulness.

The most persuasive evidence that defendant willfully violated a known legal duty were his statements that only two firearms

---

**3.** See Gun Control Act of 1968, 18 U.S.C. § 921 et seq.; National Firearms Act, 26 U.S.C. § 5801 et seq. See also Appendix 2 charting state hand-

gun laws compiled by the NRA Institute for Legislative Action. ·

could be imported into Nigeria without a license and that he had "his ways", presumably, of getting goods past Customs in Nigeria. Although this does not prove "willfulness" beyond a reasonable doubt, defendant's knowledge of Nigerian law does seem to suggest that defendant had some idea that exporting firearms from the United States might be illegal and made no effort to know U.S. law on this issue. This illustrates precisely what is wrong with construing the Arms Export Control Act as a specific intent crime. Such a construction allows individuals to intentionally stick their heads in the sand and avoid any repercussions from unlawful firearms trading.

The court finds defendant, Joseph Danley Obiechie, GUILTY as charged in Count I and NOT GUILTY as charged in Counts II, III and IV of the indictment.

ORDERED: The Clerk is ordered to enter judgments of GUILTY as to Count I and, NOT GUILTY as to Counts II, III, and IV of Indictment No. 92 CR 342.

*APPENDIX 1*

§ 121.1 General. The United States Munitions List

(a) The following articles, services and related technical data are designated as defense articles and defense services pursuant to sections 38 and 47(7) of the Arms Export Control Act (22 U.S.C. 2778 and 2794(7)). Changes in designations will be published in the Federal Register. Information and clarifications on whether specific items are defense articles and services under this subchapter may appear periodically in the Munitions Control Newsletter published by the Office of Munitions Control.

(b) Significant Military Equipment.

An asterisk precedes certain defense articles in the following list. The asterisk means that the article is deemed to be "significant military equipment" to the extent defined in § 120.19. The asterisk is placed as a convenience to help identify such articles.

CATEGORY I—FIREARMS

*(a) Nonautomatic, semi-automatic and fully automatic firearms to caliber .50 inclu-

sive, and all components and parts for such firearms. (See §§ 121.9 and 123.16–123.19)

(b) Riflescopes manufactured to military specifications, and specifically designed or modified components therefor; firearm silencers and suppressors, including flash suppressors.

*(c) Insurgency-counterinsurgency type firearms or other weapons having a special military application (e.g. close assault weapons systems) regardless of caliber and all components and parts therefore).

CATEGORY II—ARTILLERY PROJECTORS

*(a) Guns over caliber .50, howitzers, mortars, and recoilless rifles.

*(b) Military flamethrowers and projectors.

(c) Components, parts, accessories and attachments for the articles in paragraphs (a) and (b) of this category, including but not limited to mounts and carriages for these articles.

CATEGORY III—AMMUNITION

*(a) Ammunition for the arms in Categories I and II of this section. (See § 121.6)

(b) Components, parts, accessories, and attachments for articles in paragraph (a) of this category, including but not limited to cartridge cases, powder bags, bullets, jackets, cores, shells (excluding shotgun shells), projectiles, boosters, fuzes and components therefor, primers, and other detonating devices for such ammunition. (See § 121.6)

(c) Ammunition belting and linking machines.

*(d) Ammunition manufacturing machines and ammunition loading machines (except handloading ones).

CATEGORY IV—LAUNCH VEHICLES, GUIDED MISSILES, BALLISTIC MISSILES, ROCKETS, TORPEDOES, BOMBS AND MINES

*(a) Rockets (including but not limited to meteorological and other sounding rockets), bombs, grenades, torpedoes, depth charges, land and naval mines, as well as launchers

for such defense articles, and demolition blocks and blasting caps. (See § 121.11.)

*(b) Launch vehicles and missile and anti-missile systems including but not limited to guided, tactical and strategic missiles, launchers, and systems.

(c) Apparatus, devices, and materials for the handling, control, activation, monitoring detection, protection, discharge, or detonation of the articles in paragraphs (a) and (b) of this category. (See § 121.5.)

*(d) Missile and space vehicle power-plants.

*(e) Military explosive excavating devices.

*(f) Ablative materials fabricated or semi-fabricated from advanced composites (e.g., silica, graphite, carbon, carbon/carbon, and boron filaments) for the articles in this category that are derived directly from or specifically developed or modified for defense articles.

*(g) Non/nuclear warheads for rockets and guided missiles.

(h) All specifically designed or modified components, parts, accessories, attachments, and associated equipment for the articles in this category.

CATEGORY V—EXPLOSIVES, PROPELLANTS, AND INCENDIARY AGENTS

*(a) Military explosives. (See § 121.12.)

*(b) Military fuel thickeners. (See § 121.-13)

(c) Propellants for the articles in Categories III and IV of this section. (See § 121.-14)

(d) Military pyrotechnics, except pyrotechnic materials having dual military and commercial use.

(e) All compounds specifically formulated for the articles in this category.

CATEGORY VI—VESSELS OF WAR AND SPECIAL NAVAL EQUIPMENT

*(a) Warships, amphibious warfare vessels, landing craft mine warfare vessels, patrol vessels, auxiliary vessels and service craft, experimental types of naval ships and any vessels specifically designed or modified for military purposes. (See § 121.15)

*(b) Turrets and gun mounts, arresting gear, special weapons systems, protective systems, submarine storage batteries, catapults and other components, parts, attachments, and accessories specifically designed or modified for combatant vessels.

(c) Mine sweeping equipment, components, parts, attachments and accessories specifically designed or modified therefor.

(d) Harbor entrance detection devices, (magnetic, pressure, and acoustic ones) and controls and components therefor.

*(e) Naval nuclear propulsion plants, their land prototypes, and special facilities for their construction support, and maintenance. This includes any machinery, device, component, or equipment specifically developed, designed or modified for use in such plants or facilities. (See § 123.21.)

CATEGORY VII—TANKS AND MILITARY VEHICLES

*(a) Military type armed or armored vehicles, military railway trains, and vehicles specifically designed or modified to accommodate mountings for arms or other specialized military equipment or fitted with such items.

*(b) Military tanks, combat engineer vehicles, bridge launching vehicles, half-trucks and gun carriers.

*(c) Self-propelled guns and howitzers.

(d) Military trucks, trailers, hoists, and skids specifically designed, modified, or equipped to mount or carry weapons of Categories I, II and IV or for carrying and handling the articles in paragraph (a) of Categories III and IV.

*(e) Military recovery vehicles.

*(f) Amphibious vehicles. (See § 121.4.)

*(g) Engines specifically designed or modified for the vehicles in paragraphs (a), (b), (c), and (f) of this category.

(h) All specifically designed or modified components and parts, accessories, attachments, and associated equipment for the articles in this category, including but not limited to military bridging and deep water fording kits.

CATEGORY VIII—AIRCRAFT, SPACE-CRAFT, AND ASSOCIATED EQUIPMENT

*(a) Aircraft including but not limited to helicopters, nonexpansive balloons, drones, and lighter-than-air aircraft, which are specifically designed, modified, or equipped for military purposes. This includes but is not limited to the following military purposes: gunnery, bombing, rocket or missile launching, electronic and other surveillance, reconnaissance, refueling, aerial mapping, military liaison, cargo carrying or dropping, personnel dropping, airborne warning and control, and military training. (See § 121.3.)

(b)*(1) Spacecraft, including manned and unmanned, active and passive satellites (except those listed in Category VIII(b)(2)).

(2) Non-military communication satellites (excluding ground stations and associated equipment not enumerated elsewhere in § 121.1).

*(c) Military aircraft engines, except reciprocating engines, and spacecraft engines specifically designed or modified for the aircraft and spacecraft in paragraphs (a) and (b) of this category.

*(d) Cartridge-actuated devices utilized in emergency escape of personnel and airborne equipment (including but not limited to airborne refueling equipment) specifically designed or modified for use with the aircraft, spacecraft, and engines of the types i paragraphs (a), (b), and (c) of this category.

(e) Launching and recovery equipment for the articles in paragraphs (a) and (b) of this category, if the equipment is specifically designed or modified for military use or for use with spacecraft. Fixed land-based arresting gear is not included in this category.

(f) Power supplies and energy sources specifically designed or modified for spacecraft.

*(g) Inertial navigation systems and all specifically designed components, parts and accessories, except those systems or components that are standard equipment in civil aircraft, including spare parts and spare units to be used exclusively for the maintenance of inertial navigation equipment incorporated in civil aircraft, and that are certified by the Federal Aviation Administration (FAA) as being an integral part of such aircraft. All exports of technical data related to the design, development, production or manufacture of inertial navigation equipment (regardless of accuracies) or its related parts, components or subsystems are subject to the requirements of the regulations contained in this subchapter. The export of technical data related to the repair of parts, components, or subsystems of inertial navigation systems (including accelerometers and gyroscopes) that are not certified by the FAA as being an integral part of civil aircraft are subject to the requirements of this subchapter. The provisions of XI(e) and XII(c) are not applicable to such exports of technical data.

*(h) Developmental aircraft and components thereof which have a significant military applicability, excluding such aircraft and components that have been certified by the Federal Aviation Administration and determined through the commodity jurisdiction procedure specified in § 120.5 of this subchapter. To be subject to the export control jurisdiction of Department of Commerce for purposes of section 17(c) of the Export Administration Act, as amended.

*(i) Ground effect machines (GEMS) specifically designed or modified for military use, including but not limited to surface effect machines and other air cushion vehicles, and all components, parts, and accessories, attachments, and associated equipment specifically designed or modified for use with such machines.

(j) Components, parts accessories, attachments and associated equipment (including ground support equipment) specifically designed or modified for the articles in paragraphs (a) through (i) of this category, excluding aircraft tires and propellers used with reciprocating engines.

CATEGORY IX—MILITARY TRAINING EQUIPMENT

(a) Military training equipment including but not limited to attack trainers, radar target trainers, radar target generators, gunnery training devices, antisubmarine warfare trainers, target equipment, armament train-

ing units, operational flight trainers, air combat training systems, radar trainers, navigation trainers, and simulation devices related to defense articles.

(b) Components, parts, accessories, attachments, and associated equipment specifically designed or modified for the articles in paragraph (a) of this category.

CATEGORY X—PROTECTIVE PERSONNEL EQUIPMENT

(a) Body armor specifically designed, modified or equipped for military use; articles, including but not limited to clothing, designed, modified or equipped to protect against or reduce detection by radar, infrared (IR) or other sensors; military helmets equipped with communications hardware, optical sights, slewing devices or mechanisms to protect against thermal flash or lasers, excluding standard military helmets.

(b) Partial pressure suits and liquid oxygen converters used in aircraft in Category VIII(a).

(c) Protective apparel and equipment specifically designed or modified for use with the articles in paragraphs (a) through (d) in Category XIV.

(d) Components, parts, accessories, attachments, and associated equipment specifically designed or modified for use with the articles in paragraphs (a), (b), and (c) of this category.

CATEGORY XI—MILITARY AND SPACE ELECTRONICS

(a) Electronic equipment not included in Category XII of the Munitions List which is assigned a military designation or is specifically designed, modified or configured for military application. This includes but is not limited to the following:

*(1) Underwater sound equipment, including but not limited to towed arrays, electronic beam forming sonar, target classification equipment, and spectrographic displays; search, acquisition, tracking, moving target indication and imaging radar systems; active and passive countermeasures and counter-countermeasures equipment; electronic fuses; identification systems; command, control

and communication systems; and, regardless of designation, any experiment specifically designed or modified for military application, or for use with a military system and

(2) Sonic depth finders; underwater telephones; electromechanical beam forming sonars and elementary sonobuoys; radios (including transceivers); weather, navigation, and air traffic control radar systems; navigation, guidance, object-locating equipment; displays; and telemetering equipment.

(3) Armored coaxial cable capable of RF, optical, or high voltage power transmission.

(b) Space Electronics

*(1) Electronic equipment specifically designed or modified for spacecraft and space flight, and

(2) Electronic equipment specifically designed or modified for use with non-military communications satellites.

*(c) Electronic systems or equipment specifically designed, modified, configured, used or intended for use in search, reconnaissance, collection, monitoring, direction-finding, display, analysis and production of information from the electromagnetic spectrum for intelligence or security purposes and electronic systems or equipment designed or modified to counteract such surveillance and monitoring.

(d) Very High Speed Integrated Circuit (VHSIC) semiconductor devices that are specifically designed for military applications and which have a high-speed signal and image processing capability with an operational parameter (gate-time-clock-frequency) or greater than $10^{11}$ gates X hertz for an individual semiconductor device.

(e) Components, parts, accessories, attachments, and associated equipment specifically designed or modified for use or currently used with the equipment in paragraphs (a) through (c) of this category, except for such items as are in normal commercial use.

CATEGORY XII—FIRE CONTROL, RANGE FINDER, OPTICAL AND GUIDANCE AND CONTROL EQUIPMENT

*(a) Fire control systems; gun and missile tracking and guidance systems: military infrared, image intensifier and other night

sighting and night viewing equipment; military masers and military lasers; gun laying equipment; range position and height finders and spotting instruments; aiming devices (electronic, gyroscopic, optic, and acoustic); bomb sights, bombing computers, military television sighting and viewing units, inertial platforms, and periscopes for the articles of this section.

*(b) Inertial and other weapons or space vehicle guidance and control systems; spacecraft guidance, control and stabilization systems; astro compasses; and star trackers.

(c) Components, parts, accessories, attachments, and associated equipment specifically designed or modified for the articles in paragraphs (a) and (b) of this category, except for such items as are in normal commercial use.

CATEGORY XIII—AUXILIARY MILITARY EQUIPMENT

(a) Aerial cameras, space cameras, special purpose military cameras, and specialized processing equipment therefor; military photointerpretation, stereoscopic plotting, and photogrammetry equipment, and components specifically designed or modified therefor.

(b) Speech scramblers, privacy devices, cryptographic devices and software (encoding and decoding), and components specifically designed or modified therefore, ancillary equipment, and protective apparatus specifically designed or modified for such devices, components, and equipment.

(c) Self-contained diving and underwater breathing apparatus specifically designed or modified for a military purpose and components specifically designed or modified therefore.

(d) Armor plate and structural materials (including but not limited to plate, rolled and extruded shapes, bars and forgings, castings, welding consumables, carbon/carbon and metal matrix composites) specifically designed or modified for defense articles.

(e) Concealment and deception equipment, including but not limited to special paints, decoys, and simulators and components, parts and accessories specifically designed or modified therefor.

(f) Energy conversion devices for producing electrical energy from nuclear, thermal, or solar energy, or from chemical reaction which are specifically designed or modified for military application.

(g) Chemiluminescent compounds and solid state devices specifically designed or modified for military application.

(h) Devices embodying particle beam and electromagnetic pulse technology.

(i) Metal embrittling agents.

CATEGORY XIV—TOXICOLOGICAL AGENTS AND EQUIPMENT AND RADIOLOGICAL EQUIPMENT

*(a) Chemical agents, including but not limited to lung irritants, vesicants, lachrymators, tear gases (except tear gas formulations containing 1% or less CN or CS), sternutators and irritant smoke, and nerve gases and incapacitating agents. (See § 121.7.)

*(b) Biological agents.

*(c) Equipment for dissemination, detection, and identification of, and defense against, the articles in paragraphs (a) and (b) of this category.

*(d) Nuclear radiation detection and measuring devices, manufactured to military specification.

(e) Components, parts, accessories, attachments, and associated equipment specifically designed or modified for the articles in paragraphs (c) and (d) of this category.

CATEGORY XV—[RESERVED]

CATEGORY XVI—NUCLEAR WEAPONS DESIGN AND TEST EQUIPMENT

*(a) Any article, material, equipment, or device which is specifically designed or modified for use in the design, development, or fabrication of nuclear weapons or nuclear explosive devices. (See § 123.21 and Department of Commerce Export Regulations, 15 CFR part 378.)

*(b) Any article, material, equipment, or device which is specifically designed or modified for use in the devising, carrying out, or evaluating of nuclear weapons test or any other nuclear explosions, except such items as are in normal commercial use for other purposes.

## CATEGORY XVII—CLASSIFIED ARTICLES NOT OTHERWISE ENUMERATED

All articles and technical data (as defined in § 120.21) relating thereto which are classified in the interests of national security and which are not otherwise enumerated in the U.S. Munitions List.

## CATEGORY XVIII—TECHNICAL DATA

Technical data (as defined in § 120.21) relating to the defense articles listed in the other categories of the United States Munitions List. (See § 125.4 for exemptions; see also § 123.21.)

## CATEGORY XIX—DEFENSE SERVICES

Defense services (as defined in § 120.8) related to the defense articles listed in the other categories of the United States Munitions List.

## CATEGORY XX—SUBMERSIBLE VESSELS, OCEANOGRAPHIC AND ASSOCIATED EQUIPMENT

*(a) Submersible vessels, manned and unmanned, designed or modified for military purposes or having independent capability to maneuver vertically or horizontally at depths below 1,000 feet or powered by nuclear propulsion plants.

*(b) Submersible vessels, manned or unmanned, designed or modified in whole or in part from technology developed by or for the U.S. Armed Forces.

(c) Any of the articles in Categories VI, IX, XI, XIII, and elsewhere in this subchapter specifically designed or modified for use with submersible vessels, and oceanographic or associated equipment assigned a military designation.

(d) Equipment, components, parts, accessories, and attachments specifically designed or modified for any of the articles in paragraphs (a) and (b) of this category.

## CATEGORY XXI—MISCELLANEOUS ARTICLES

Any article not specifically enumerated in the other categories of the U.S. Munitions List which has substantial military applicability and which has been specifically designed or modified for military purposes. The decision on whether any article may be included in this category shall be made by the Director of the Office of Munitions Control.

22 CFR § 121.1.

*APPENDIX 2*

## COMPENDIUM OF STATE LAWS GOVERNING HANDGUNS

### 1993

### Compiled by the NRA Institute for Legislative Action

The following chart lists the main provisions of state handgun laws as of March 1993 In addition to the state provisions, the purchase, sale and, in certain circumstances, the possession and interstate transportation of firearms are regulated by the Federal Gun Control Act of 1968, as amended by the Firearms Owners' Protection Act Also, cities and localities may have their own handgun ordinances in addition to federal and state restrictions. Details may be obtained by contacting local law enforcement authorities, or by consulting your state's firearms law digest compiled by the NRA Institute for Legislative Action.

*SINCE STATE LAWS ARE SUBJECT TO FREQUENT CHANGE, THIS CHART IS NOT TO BE CONSIDERED AS LEGAL ADVICE OR A RESTATEMENT OF THE LAW.*

NOTE: State constitutional provisions on firearms vary considerably The Connecticut constitution serves as an example of the basic features contained in the constitutions of many states: "Every citizen has a right to bear arms in defense of himself and the state." (Article 1, Section 15)

| STATE | PURCHASE: Application and Waiting Period | License or Permit to Purchase | Registration | Record of Sales Sent State or Local Govt. | CARRYING: Carrying Openly Prohibited | Carrying Concealed Prohibited | License to Carry Openly | License to Carry Concealed | OWNERSHIP: Owner Licensing or I.D. Cards | Constitutional Provision |
|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA | X | -- | -- | X | -- | X | X¹ | X | -- | X |
| ALASKA | -- | -- | -- | -- | -- | X | -- | -- | -- | X |
| ARIZONA | -- | -- | -- | -- | -- | X | -- | -- | -- | X |
| ARKANSAS | -- | -- | -- | -- | X² | X² | -- | -- | -- | X |
| CALIFORNIA | X | -- | -- | X | X⁴ | X | -- | X | -- | -- |
| COLORADO | -- | -- | -- | -- | -- | X | -- | X | -- | X |
| CONNECTICUT | X | -- | -- | X | -- | - | X | X | -- | X |
| DELAWARE | -- | -- | -- | -- | -- | X | -- | X | -- | X |
| FLORIDA | X | -- | -- | -- | -- | -- | X | X | -- | X |
| GEORGIA | -- | -- | -- | -- | -- | -- | X | X | -- | X |
| HAWAII | X | X | X | X | -- | -- | X | X | -- | X |
| IDAHO | -- | -- | -- | -- | -- | X | -- | X | -- | X |
| ILLINOIS | X | X | X³⁄⁶ | X | X | X | -- | -- | X⁶ | X |
| INDIANA | X | -- | -- | X | -- | -- | X | X | -- | X |
| IOWA | -- | X | -- | X | -- | -- | X | X | -- | -- |
| KANSAS | X⁵ | X⁵ | X⁵ | -- | -- | X | -- | -- | -- | X |
| KENTUCKY | -- | -- | -- | -- | -- | X | -- | -- | -- | X |
| LOUISIANA | -- | -- | -- | -- | -- | X | - | X | -- | X |
| MAINE | -- | -- | -- | -- | -- | X | -- | X | -- | X |
| MARYLAND | X | -- | -- | X | -- | -- | X | X | -- | -- |
| MASSACHUSETTS | -- | X | -- | X | -- | -- | X | X | X | X |
| MICHIGAN | -- | X | X⁵ | X | -- | -- | X¹ | X | -- | X |
| MINNESOTA | X | X | -- | X | -- | -- | X | X | -- | -- |
| MISSISSIPPI | -- | -- | -- | -- | -- | X | -- | X | -- | X |
| MISSOURI | -- | X | -- | X | -- | X | -- | -- | -- | X |
| MONTANA | -- | -- | -- | -- | -- | X | -- | X | -- | X |
| NEBRASKA | -- | X | -- | -- | -- | X | -- | -- | -- | X |
| NEVADA | X⁶ | -- | X⁶ | -- | -- | X | -- | X | -- | X |
| NEW HAMPSHIRE | -- | -- | -- | -- | -- | X | -- | X | -- | X |
| NEW JERSEY | X | X | -- | X | -- | -- | X | X | X | -- |
| NEW MEXICO | -- | -- | -- | -- | -- | X | -- | -- | -- | X |
| NEW YORK | -- | X | X | -- | -- | -- | X | X | X | - |
| NORTH CAROLINA | -- | X | -- | X | -- | X | -- | -- | -- | X |
| NORTH DAKOTA | -- | -- | -- | X | X⁴ | X | -- | X | -- | X |
| OHIO | X⁷⁄⁶ | X⁷⁄⁶ | -- | X⁷⁄⁶ | -- | X | -- | -- | -- | X |
| OKLAHOMA | -- | -- | -- | -- | X⁴ | X | -- | -- | -- | X |
| OREGON | X | -- | -- | X | -- | X | -- | X | -- | X |
| PENNSYLVANIA | X | -- | -- | X | -- | -- | X¹ | X | -- | X |
| RHODE ISLAND | X | -- | -- | X | -- | -- | X | X | -- | X |
| SOUTH CAROLINA | -- | -- | -- | X | -- | -- | X | X | -- | X |
| SOUTH DAKOTA | X | -- | -- | X | -- | X | -- | X | -- | X |
| TENNESSEE | X | -- | -- | X | X⁵ | X⁵ | -- | -- | -- | X |
| TEXAS | -- | -- | -- | -- | X | X | -- | -- | -- | X |
| UTAH | -- | -- | -- | -- | X⁴ | X | -- | X | -- | X |
| VERMONT | -- | -- | -- | -- | X⁴ | X⁴ | -- | -- | -- | X |
| VIRGINIA | X⁶ | X⁶ | -- | -- | -- | X | X⁴ | X | -- | X |
| WASHINGTON | X | -- | -- | X | X⁴ | X | -- | X | -- | X |
| WEST VIRGINIA | -- | -- | -- | -- | -- | X | -- | X | -- | X |
| WISCONSIN | X | -- | -- | X | -- | X | -- | -- | -- | -- |
| WYOMING | -- | -- | -- | -- | -- | X | -- | X | -- | -- |
| DISTRICT OF COLUMBIA | -- | X¹⁰ | X¹⁰ | -- | -- | X | X | -- | -- | X¹⁰ |

### HANDGUNS

¹License to carry in a vehicle either openly or concealed

²Arkansas prohibits carrying "with a purpose to employ it as a weapon against a person" Tennessee prohibits carrying "with the intent to go armed"

³Chicago only.

⁴Loaded

⁵Handguns must be presented to the city chief of police or county sheriff to obtain a certificate of inspection

⁶Handguns prohibited in Evanston, Oak Park, Morton Grove, Winnetka, Wilmette, and Highland Park

⁷Some municipalities control the possession, sale, transfer or carrying of handguns; e g Cleveland and Columbus require a police permit for purchase, Toledo requires a handgun owners' I D ; Cincinnati requires application for purchase In addition, some forbid the possession and sale of handguns with a certain magazine capacity, usually 20 rounds or more.

⁸Prohibits carrying a firearm "with the intent or purpose of injuring another."

⁹Certain cities or counties

¹⁰Applies only to pre-registered firearms No new handguns may be brought into the city

NL3N0659

Rev. 3/93 50M